209 N.J. Super. 99 (1986)
506 A.2d 1280
ALBERT DE FALCO, PLAINTIFF-APPELLANT,
v.
JACK ANDERSON AND PARADE PUBLICATIONS, INC. (A FOREIGN CORPORATION NOT REGISTERED TO DO BUSINESS IN NEW JERSEY) DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 13, 1986.
Decided March 21, 1986.
*100 Before Judges KING, SIMPSON and SCALERA.
Fredric J. Gross, attorney for appellant.
*101 Robinson, Wayne, Levin, Riccio & LaSala, attorneys for respondents (Edward F. Lamb and Jack M. Sabatino, on the brief; Ralph P. Huber of the New York bar, of counsel).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal is taken from a directed verdict granted after presentation of the plaintiff's case in a libel action filed against columnist Jack Anderson and Parade Publications, Inc. R. 4:37-2. The allegedly defamatory article appeared in Parade Magazine on August 7, 1977.
Before trial, Judge Malech had ruled that plaintiff was a "public figure"; thus, proof of actual or New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), malice was required. That point is not pursued on appeal by plaintiff. After presentation of plaintiff's case in October 1984, Judge Troast granted defendants' motions for involuntary dismissal. He basically found that plaintiff failed to present proof upon which the jury could have found actual malice.
Defendant Parade Publications, Inc. (Parade), is the publisher of Parade magazine, a nationally-distributed Sunday newspaper supplement. On August 7, 1977, the magazine's cover story which appeared across two inside pages of the publication was entitled, "The Shadow of the Mafia Over Our Government." The text of the article was written by defendant Jack Anderson, a Pulitzer Prize-winning author and columnist who also served as the magazine's Washington Bureau Chief. The final editing of the text, the selection of illustrations, the pictorial captions, the headlines, the subheadings and the article's layout in the magazine were controlled by the late Jess Gorkin, long-time editor of Parade.
The Parade article described the relationship between racketeers and government officials. It discussed, among other politicians, former New Jersey Congressman Henry Helstoski who had been investigated, and later indicted by a federal *102 grand jury, for collecting fees from aliens in return for introducing private bills in Congress to delay their deportation. The article recounts Helstoski meeting with racketeer Frank Peroff and how he asked Peroff to do some background "investigation" on some of the aliens who might testify against him, including one Oswaldo Aguirre. The article states that Peroff confirmed his meeting with Helstoski. The article notes that, according to Peroff, Helstoski wanted Peroff to bribe Chilean officials to fabricate shady pasts for the government witnesses and says they had even discussed murdering Aguirre.
A photograph of Albert DeFalco, shown conferring with his criminal defense attorney, appears under the article's headline. The caption underneath that photograph, which was the largest picture among the six photos appearing in the article's layout, stated
"Albert DeFalco (above left) confers with lawyer after being convicted of extorting $36,000 from illegal aliens in return for promoting bills to delay deportation. DeFalco was an aide to Congressman Henry Helstoski (right), who was voted out of office last year...."
The caption then describes that Helstoski, who "continues to proclaim his innocence in the matter", had asked racketeer Peroff to check the backgrounds of the Chilean aliens who were expected to testify against the ex-Congressman.
The text of the 28-paragraph Parade article refers only once to DeFalco. That reference appears midway in the article
Then there is the curious case of Rep. Henry Helstoski (D., N.J.) who was narrowly voted out of Congress last year. In 1974, a federal grand jury began investigating charges that he had collected fees from illegal aliens in return for introducing private bills to delay their deportation. His former aide, Albert DeFalco, was convicted of shaking down the aliens for $36,000, but Helstoski has continued to proclaim his innocence.
The article then describes how Helstoski met with Peroff at Dulles Airport to propose the background "investigation" of the aliens and how the two discussed murdering the government's key witness, "a Chilean named Oswaldo Aguirre."
Other than the sentence quoted, the Parade article makes no mention of plaintiff Albert DeFalco. He is neither referred to *103 in the headline nor in the subheadings. He is not described as a gangster, racketeer, mobster, or as a member of the Mafia. The article refers to DeFalco solely in connection with the allegations concerning his former employer, Congressman Helstoski, the racketeer Peroff, and the Chilean aliens for whom Helstoski introduced private bills in Congress. DeFalco's photograph is displayed with a photograph of Helstoski and a common caption describing the immigration offenses.
Prior to the publication of the Parade article, plaintiff had been convicted and sentenced in the United States District Court of the District of New Jersey for crimes stemming from his participation in a scheme to secure illegal payments from aliens in Helstoski's Congressional District. On June 12, 1975 a federal grand jury in Newark returned a multi-count indictment against Albert DeFalco, a/k/a "A. Falcone", and five others, charging them with violations of Sections 2, 371 and 912 of Title 18 of the United States Code. On October 17, 1975 a federal jury in Newark returned a guilty verdict against DeFalco on all five counts charged. DeFalco was convicted by that jury of: (a) knowingly conspiring to defraud the United States by impeding the lawful functions of the Immigration and Naturalization Service, (b) falsely presenting and representing himself to be a current aide of Congressman Henry Helstoski and in acting as such demanding and obtaining monies from illegal aliens residing in the United States, and (c) falsely impersonating a federal officer and demanding monies on two different occasions.
DeFalco's conviction on the conspiracy count (Count One) represented a jury's finding that DeFalco and his co-conspirators deceived the aliens into believing that they would have to pay money in order to obtain aid to secure legal permanent residence in the United States. This included the introduction of private bills in the House of Representatives by Congressman Helstoski. It was also alleged that, as part of the conspiracy for which DeFalco was convicted, the aliens were threatened with bodily harm and deportation in order to secure their silence. By returning a guilty verdict on Counts Two and *104 Three, the jury found that DeFalco falsely impersonated a federal officer, i.e., an aide to Congressman Helstoski, and, in acting as such, demanded and obtained money from two illegal aliens.
Judge Lacey sentenced DeFalco in December 1975 to six years for these convictions. DeFalco entered prison on December 7, 1976 and was assigned to the Federal Correctional Institution in Sandstone, Minnesota. Several newspapers, including the Bergen Record, reported the sentence imposed on DeFalco. The lead paragraph of the Record's article said that DeFalco was sentenced to six years "for extorting $36,000 from illegal aliens."
On January 10, 1976 defendant Jack Anderson reported in his syndicated daily column that Helstoski had appeared before a federal jury eight times in the preceding 19 months on the immigration matters. Anderson specifically observed in that column that Helstoski's former aide DeFalco had been convicted "of masterminding a scheme to bilk illegal aliens out of $36,000 for private immigration bills."
On March 12, 1976 Anderson wrote a second daily column about these matters, entitled "The Congressman and the Criminal." In that column, Anderson recounted Helstoski's rendezvous with racketeer Peroff at Dulles Airport. The March 12 column also noted that Helstoski's "former aide, Albert DeFalco, already has been convicted of shaking down the aliens for $36,000."
In June 1976 DeFalco was named as an unindicted co-conspirator in an indictment returned against Congressman Helstoski. Count Twelve of that indictment charged Helstoski with perjury in connection with his grand jury testimony with regard to the Peroff meeting, a meeting later referred to in the Parade article. Helstoski was defeated in that fall's congressional race. However, the indictment was ultimately dismissed in deference to the privileges conferred upon members of Congress under the Speech or Debate Clause of the United States *105 Constitution. See Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), for background. The Parade article of which DeFalco complains in this case appeared on August 7, 1977 while he was still in federal prison and while Helstoski was still under indictment.
Plaintiff's theory of the case is quite simple. He contends that the Parade article implies that he is a Mafioso and defames him. Further, he argues that defendants acted with actual malice because they had a reckless disregard for the truth or falsity of their "Mafia imputation." As proof on this latter point, he notes the testimony of Jack Anderson who in response to the question, "To your knowledge is Mr. DeFalco in the Mafia?" replied, "Not to my knowledge." In response, defendants assert that the Parade article in no way defames plaintiff. They contend that they did not intend to imply that plaintiff was in the Mafia and that no such implication was conveyed by the article. In support of their argument they point to the essential accuracy of the caption under DeFalco's picture and the textual reference to him. Since defendants did not imply that plaintiff was a Mafioso, Anderson's testimony as to plaintiff's membership in the Mafia, they contend, was irrelevant. They urge that the article they published did not defame plaintiff and that neither defendant entertained any doubt as to the substantive accuracy of the article's references to plaintiff and that this should preclude a finding that they acted with actual malice.
In this State "it is the function of the court, not the jury, in the first instance to determine whether the language used is reasonably susceptible of a defamatory meaning." Herrmann v. Newark Morning Ledger, Co., 48 N.J. Super. 420, 429-430 (App.Div. 1958) (cited approvingly in Lawrence v. Bauer Pub. & Print., Ltd., 89 N.J. 451, 459 (1982). "Only if the language is ambiguous in the sense of being reasonably subject to either an innocent or a defamatory meaning, as determined by the court, does the jury decide as a question of fact whether the readers *106 of the publication understood the language in its defamatory sense." Herrmann, 48 N.J. Super. at 430.
We conclude that plaintiff did not present a case for the jury to decide that the article defamed him by alleging that he was a member of the Mafia. The caption under plaintiff's photograph and the textual reference to him are factually accurate, except for the $36,000 figure. The actual amount illegally obtained was somewhat less, but still substantial. The $36,000 figure had appeared in other news stories as well as in two earlier Jack Anderson columns without any complaint from plaintiff. Judge Malech properly found that the monetary discrepancy alone was not defamatory and that the words "extorting" and "shaking down" were fair characterizations of the federal crimes.
Nowhere in the article is plaintiff described as a member of the Mafia. He was not described as a gangster, racketeer or mobster, as were others specifically mentioned in the article. For example,
"Gangster Joe Zicarelli"
"Underworld chieftain Gus Greenbaum"
"Racketeer named Frank Peroff"
"Sam Calabrese, who was linked to the Mafia's notorious Gambino family"
"Sanford Rafsky, identified ... as the `new Meyer Lansky'"
"Lansky ... The Miami mob's financial whiz"
The article identified plaintiff only as Helstoski's former aide.
In respect of the function of appellate review in the First Amendment "public-figure" defamation context, the United States Supreme Court recently said
The requirement of independent appellate review reiterated in New York Times v. Sullivan is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common law heritage. It reflects a deeply held conviction that judges  and particularly members of this Court  must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. [Bose Corp. v. Consumers *107 Union of U.S., Inc., 466 U.S. 485, 510-511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984)].
We must, "as expositors of the constitution, ... independently decide whether the evidence in the record is sufficient to cross the constitutional threshold...." Ibid., cited with approval in Burke v. Deiner, 97 N.J. 465 (1984). We are satisfied as a matter of law that the article was truthful and accurate, did not defame the plaintiff, and that any alleged defamation by inference, or innuendo is unfounded, was speculative and not actionable in this context  a discussion of the criminal corruption of high public officials and their aides.
The article carefully avoided describing plaintiff as anything but a former aide to Congressman Helstoski. What defendants published about plaintiff was true. We here adopt the view that there is "no libel by innuendo of a public figure where the challenged communication is true." Strada v. Conn. Newspapers, Inc., 193 Conn. 313, 477 A.2d 1005, 1012 (1984). As Chief Justice Speziale of Connecticut there noted
When any inference or innuendo does not arise from the omission of material facts, but rather from the editorial choice of layout, the plaintiff may not recover for libel by innuendo. The media would be unduly burdened if, in addition to reporting facts about public officers and public affairs correctly, it had to be vigilant for any possibly defamatory implication arising from the report of those true facts. "[T]he pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." New York Times Co. v. Sullivan, supra, 376 U.S. 278, 84 S.Ct. 725; see Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C. Cir.1966). [Ibid.].
See Schaefer v. Lynch, 406 So.2d 185, 188 (Sup.Ct. 1981) ("Where public officers and public affairs are concerned, there can be no libel by innuendo."); Gouthro v. Gilgun, 12 Mass. App. Ct. 591, 427 N.E.2d 1166 (1981), rev. den. 385 Mass. 1101, 440 N.E.2d 1173 (1982); Mihalick v. Duprey, 11 Mass. App. Ct. 602, 417 N.E.2d 1238, 1241 (1981) ("insinuating overtone" not sufficient for action against public figure); Loeb v. New York Times Communications Corp., 497 F. Supp. 85, 91 (S.D.N.Y. 1980); Reliance Insurance Co. v. Barrons, 442 F. Supp. 1341 (S.D.N.Y. 1977) ("snide tone" showing "mere aversion or scorn" *108 not enough in public figure case); see also Restatement, Torts 2d, § 581A at 235 (1977).
Affirmed.