258 N.J. Super. 493 (1992)
610 A.2d 425
LAWRENCE S. SCHWARTZ AND SCHWARTZ, PISANO, SIMON, EDELSTEIN & BEN ASHER, A PARTNERSHIP, PLAINTIFFS-RESPONDENTS,
v.
WORRALL PUBLICATIONS, INC., A NEW JERSEY CORPORATION; CHRIS GATTO AND JOHN DOE (A FICTITIOUS NAME REPRESENTING A PARTY OR PARTIES UNKNOWN), DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1992.
Decided July 22, 1992.
*495 Before Judges R.S. COHEN and KESTIN.
A.F. McGimpsey, Jr., argued the cause for appellant Worrall Publications, Inc. (McGimpsey & Cafferty, attorneys, Thomas J. Cafferty and Arlene M. Turinchak on the brief).
Stephen J. Edelstein argued the cause for respondents (Schwartz, Simon & Edelstein, attorneys, Stephen J. Edelstein and David C. Bendush on the brief).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
This is a defamation case. On leave granted, defendant Worrall Publications, Inc., appeals the denial of its motion for summary judgment. We reverse.
Worrall publishes the Belleville Post (Post), a free weekly newspaper. Plaintiff Lawrence Schwartz is an attorney who represented the New Jersey School Boards Association (Association) when it came under the scrutiny of the State Commission of Investigation (SCI) for losses which the Association's insurance *496 group had sustained. Schwartz is a past-president of the Association, a former Belleville School Board attorney, and a partner in the law firm of Schwartz, Simon & Edelstein.
On Thursday, March 29, 1990, the front page of the Post carried an article headlined, "State investigating former BOE [Board of Education] attorney." The by-line attributed authorship to Post staff writer Chris Gatto, a defendant here. Although Schwartz was in fact not the target or focus of any investigation by SCI, the article stated:
A former Belleville school board attorney who once served as president of the New Jersey School Boards Association, is now the target of a state investigation as the recipient of allegedly excessive legal fees stemming from an ongoing insurance controversy.
The association, which employs a $70,000-a-year attorney to head its own staff, is awaiting the results of an investigation by the [SCI] into the fees charged by Livingston-based attorney Lawrence S. Schwartz. The investigation is looking into losses sustained by the association's Insurance Group. The SCI report is expected to be completed shortly.
....
Schwartz, who is also a former Belleville school board member, served as the association president from 1976 to 1978. According to Frank Belluscio, a spokesman for the [association], Schwartz's fees have totalled $353,851.
Belluscio said Schwartz was paid $297,617 to represent the association in its dealings with the SCI, the investigation now focusing on him. The balance was paid to the lawyer for representing the association in three separate lawsuits that arose from the loss.
Jeremiah Regan, the association's president said Schwartz was hired by the group because of his familiarity with school law and the association itself. The attorney represents 22 school boards in the state. Regan said he saw no possible conflict in hiring a former president.
Schwartz was hired without following the bidding process  in accordance with the state law that permits contracting for services without bids.
....
About two weeks later, Schwartz's law firm sent the Post a letter demanding an immediate retraction of the "false and defamatory statements." One was not printed until June 21, 1990, over a month after suit had been started against Worrall and Gatto. The complaint alleged that the article was defamatory, damaged Schwartz and his law firm, and tortiously interfered with the firm's business advantages.
*497 Worrall moved for summary judgment on the theses that the Post article was not "of and concerning" the law firm, and that Schwartz was a public official or figure who failed to establish actual malice on the part of defendants. Schwartz and his law firm cross-moved, seeking partial summary judgment on the question whether the statements in the article were defamatory. The Law Division judge denied Worrall's motion, and granted plaintiffs partial summary judgment. We granted Worrall's application for leave to appeal from the order denying its motion.
The facts before the motion judge were essentially undisputed. Gatto got the idea for an article from a front-page story that appeared in the Sunday, March 25, 1990, edition of the Star Ledger. Its headline was, "Schools group paid ex-leader high fees." Like the Post article, the Star Ledger piece described the circumstances of Schwartz's hiring and the size of his fee. Unlike the Post article, it did not say that Schwartz or his fees were the subject of SCI investigation. Apparently, neither did the original version of the Post article. That version was drafted by Gatto, after he briefly spoke with Schwartz about his fees and verified the accuracy of the Star Ledger article with Belluscio, the Association spokesman. Gatto completed his draft and left it for his editor, Joseph Cammelieri, late that Monday evening. Gatto then left for Washington, D.C., to cover another story.
Cammelieri found Gatto's draft confusing when he reviewed it on Tuesday evening. He read it three times, and then thought he "knew what [Gatto] was trying to say." Intending to simplify and clarify the story, Cammelieri edited it in the mistaken belief that Schwartz himself was the target of the SCI investigation. Cammelieri explained:
I was under the assumption that because there was a local angle, that the reason the story was being written was that the local person was the gist of the story.... I was confused. So in my confusion, I saw a local person; and I assumed that oh, this local person must be the primary focus of the story and I was trying to simplify it.
*498 He did not speak with Gatto about the article during the editing process, even though Gatto had phoned in two or three times on his way back from Washington.[1] He did not have access to Gatto's notes, and did not see the Star Ledger article upon which he knew Gatto had relied. By the time Gatto returned, Cammelieri had already left the Post offices, and the copy for the Thursday paper had been completed.
When the article was published on Thursday, March 29, Gatto recognized the inaccuracies and spoke to Cammelieri about them. Cammelieri "made a mental note of making a correction" in the next issue, but it slipped his mind. Then the Association contacted the Post to notify it that the information in the article was not correct. Then came the retraction demand from Schwartz's firm on April 14. A meeting was held at the Post, and Cammelieri was directed to draft a retraction story. The draft was reviewed by Worrall's counsel, and was never published. A retraction ultimately appeared late in June, after the SCI report had been released. The report made no reference to Schwartz or fees charged by him.
The motion judge concluded that the Post article "sounded to the disreputation of both Schwartz and his law firm," and was therefore defamatory on its face. He did not determine whether Schwartz was a public official or figure because of his conclusion that it clearly and convincingly appeared that
this defamatory falsehood created a substantial danger; a clear and present danger and destruction of the reputation of Mr. Schwartz and his law firm and the conduct it was highly unreasonable conduct constituting an extreme departure from the standards of investigation which were none and reporting which was without any reasonable basis ordinarily adhered to by responsible publishers. [citing Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967).]
The judge was particularly disturbed by the delay in publication of a retraction, the fact that Cammelieri never sought clarification from anyone or any source, the negative implications *499 suggested by the article's truthful discussion of Schwartz's hiring (i.e., without public bidding, and despite the fact that the Association had a staff attorney), and the judge's belief that Worrall "deliberately created" a conflict-of-interest "fiction" between Schwartz and the Association. The judge supposed that the article was written "to sell newspapers; to shock the public into buying them ... for the business purposes of [Worrall] or of Cammelier [sic] individually or of Gatto."
Although the motion judge passed the question, we have no hesitation concluding that Schwartz is a public figure, who, in order to recover damages for defamation, must prove with convincing clarity that the false statements were published "with `actual malice'  that is, with knowledge that [they] were false or with reckless disregard of whether [they] were false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686, 706 (1964); see Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Curtis Publishing, supra, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094. In the trial of such an action, the judge should decide at the threshold whether a defamation plaintiff is a public official or figure since the existence of the New York Times privilege is itself dependent on the status of the person defamed. See Vassallo v. Bell, 221 N.J. Super. 347, 370, 534 A.2d 724 (App. Div. 1987).
Schwartz has long been involved with this State's education system, in the past as a school district attorney and Association president, and, at the time of the offending article's publication, as counsel to more than a score of individual school districts as well as the Association. The Association's insurance problems generated widespread and justifiable media attention. As its attorney, Schwartz voluntarily assumed a particularly visible position in the forefront of a very public issue. In that position, he invited and received comment and attention. As to matters connected to his representation of the Association, therefore, he was a public figure. See Gertz, supra, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808; Vassallo, supra, 221 N.J. Super. *500 at 364-70, 534 A.2d 724; see also Lawrence v. Bauer Publishing & Printing Ltd., 89 N.J. 451, 446 A.2d 469, cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982) (officers of taxpayers' association active in collecting signatures for a referendum were public figures because of their voluntary and active participation in a public controversy which had brought them media and public exposure).
A public figure plaintiff's proofs, in order to survive a media defendant's motion for summary judgment, must establish actual malice by clear and convincing evidence. In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court held that where there is a factual dispute regarding the existence of actual malice in public figure defamation cases, the appropriate summary judgment inquiry is "whether the evidence in the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Id. at 255-56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. The basis for the Liberty Lobby rule is that the substantive evidentiary standards that apply to a case guide the determination whether a particular factual dispute requires submission to a jury. Id. at 255, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. New York Times held that the First Amendment requires that a public figure plaintiff demonstrate actual malice with "convincing clarity." 376 U.S. at 285-86, 84 S.Ct. at 729, 11 L.Ed.2d at 710. Therefore, in order to withstand a motion for summary judgment, the plaintiff must at least show that, applying the New York Times clear and convincing evidentiary standard, a reasonable jury could find actual malice. Liberty Lobby, supra, 477 U.S. at 255-56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. In this respect, then, the standards that guide the motion judge closely mirror those that apply in determining whether to direct a verdict. Id. at 250-54, 106 S.Ct. at 2511-13, 91 L.Ed.2d at 213-15.
*501 On the other hand, where actual malice is implicated as a common-law concept in the application of common-law privileges, the traditional test for summary judgment applies because the evidentiary burden at trial is not controlled by New York Times. See Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 156, 516 A.2d 220 (1986). In Dairy Stores, the defendants sought the protection of the common-law privilege of fair comment; therefore, the question on summary judgment was whether there was a genuine issue of material fact that the defendants published with actual malice. See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75, 110 A.2d 24 (1954).
Here, however, we deal with actual malice as a constitutional concept since Schwartz's public figure status invokes the New York Times standard. The key question then, on Worrall's motion for summary judgment, is whether a reasonable jury could find by clear and convincing evidence that Worrall acted with actual malice. See Hudak v. Fox, 215 N.J. Super. 233, 237-39, 521 A.2d 889 (App.Div. 1987). In independently reviewing the whole record, as New York Times requires, 376 U.S. at 284-85, 84 S.Ct. at 728, 11 L.Ed.2d at 709, we conclude that Schwartz's proofs fail to meet that test.
Our review of the evidence reveals no indication that anyone at Worrall knew that the facts being published were false. The parties' proofs have focused on whether the false statements were made with a reckless disregard for the truth. The record would justify a finding of an irresponsible and uncaring attitude on Worrall's part. However, that is not the same as reckless disregard. To demonstrate reckless disregard, a public figure plaintiff must produce clear and convincing evidence that the statements were published with a "high degree of awareness of their probable falsity," Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 133 (1964), or with "serious doubts as to the truth of [the] *502 publication," St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).
The Law Division judge placed great emphasis on his conclusion that there was deviation from professional standards of reporting and publishing. That may well have been true, at least at the editing stage. Both Gatto and Cammelieri had very little career journalism experience. However, a "professional standards" rule does not control public figure libel cases. Such a rule, suggested by four justices in Curtis Publishing, supra, has never been endorsed by a majority of the Court. The New York Times actual malice standard plainly requires a public figure plaintiff to "prove more than an extreme departure from professional standards." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 665, 109 S.Ct. 2678, 2684, 105 L.Ed.2d 562, 575 (1989).
The factors upon which the motion judge relied could not support a jury finding by clear and convincing evidence that Worrall published with actual malice. First, Cammelieri's slipshod editing may well have been very negligent, but it did not amount to a reckless disregard for the truth. It did not demonstrate a high degree of awareness of probable falsity or serious doubt as to the publication's truth. See, e.g., Lawrence, supra, 89 N.J. at 468, 446 A.2d 469 ("[C]areless and perhaps irresponsible account of the information received concerning the scope of the City Attorney's investigation ... [was] `constitutionally insufficient' to present a jury question of actual malice.").
Schwartz presented no evidence to contradict or throw doubt on Cammelieri's testimony that, in his haste to edit the article while managing multiple responsibilities, he pared Gatto's text down to make it more readable, without realizing that his snap conclusions had actually changed the story's intended focus. That explanation does not excuse the unfortunate result, but it also does not provide clear and convincing evidence of a reckless disregard for the truth. New York Times recognized that *503 the publication of inaccurate statements is protected by the First Amendment: "[E]rroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the `breathing space' that they need ... `to survive.'" 376 U.S. at 271-72, 84 S.Ct. at 721, 11 L.Ed.2d at 701 (citation omitted).
There is nothing in the record to question Cammelieri's account, and there was no basis for the motion judge to reject Cammelieri's deposition testimony that he was confused by Gatto's draft. The testimony was not inherently unlikely. The published article is a mish-mash, and itself expresses obvious confusion and a lack of understanding of the subject. In addition, Worrall and Cammelieri had no agenda that could have generated a purpose to damage Schwartz in print, and then later lie about it.
Second, although we disagree with Worrall's position that a delay in printing a retraction never bears on the question of actual malice, we cannot ascribe nearly as much evidential worth to the delay as Schwartz urges. Compare New York Times, supra, 376 U.S. at 286-87, 84 S.Ct. at 729, 11 L.Ed.2d at 710 (not deciding whether failure to retract may ever constitute adequate evidence of malice for constitutional purposes) and Connelly v. Northwest Publications, Inc., 448 N.W.2d 901, 905 (Minn. Ct. App. 1989) (failure to retract not probative of actual malice; rather, it provided evidence that publishers reasonably believed plaintiff had not been defamed) with Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc., 708 F.2d 944, 950 (5th Cir.1983) (refusal to print retraction supported jury finding that article was published with actual malice) and Restatement (Second) of Torts § 580A cmt. d (1976) ("Under certain circumstances evidence [of a failure to retract] might be relevant in showing recklessness at the time the statement was published."). Certainly, the delay says little, if anything, about the editor's state of mind at the time of publication. See, e.g., Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502, 524 (1984) *504 (defendant-author's refusal to admit mistake did not establish that he realized the inaccuracy at the time of publication); Curran v. Philadelphia Newspapers, Inc., 376 Pa.Super. 508, 546 A.2d 639, 648 (1988), allocatur denied, 522 Pa. 576, 559 A.2d 37 (1989) (focus is upon what defendant did, not what it did not do).
As post-publication inaction, the failure to promptly retract may be relevant in evaluating a media defendant's motives. However, like evidential factors concerning journalistic care (or lack thereof), motive evidence is relevant only circumstantially, and "courts must be careful not to place too much reliance on such factors." Harte-Hanks, supra, 491 U.S. at 668, 109 S.Ct. at 2686, 105 L.Ed.2d at 577. In any event, there was no evidence at all that Worrall somehow conspired or harbored ill-will against Schwartz and his law firm, and, as a result, consciously prolonged the sting of the article's false statements. Finally, even if Worrall and its employees were acting to further some undisclosed political or financial motives, as the motion judge supposed, such motives cannot provide a sufficient basis for finding actual malice. Id.; see id. at 667, 109 S.Ct. at 2685, 105 L.Ed.2d at 576.
The motion judge also improperly drew inferences of defamation from the article's truthful statements about the circumstances surrounding Schwartz's hiring and his prior affiliation with the Association. It is not disputed, for example, that Schwartz was hired without public bidding, that the Association has an attorney of its own, and that Schwartz is an Association past-president. Defamatory meaning cannot be ascribed either directly or by inference to statements like those. See DeFalco v. Anderson, 209 N.J. Super. 99, 107, 506 A.2d 1280 (App.Div. 1986).
We are not insensitive to the difficulty in deciding questions of summary judgment when state of mind is a critical factor, as it is when the actual malice concept is in issue. It is true, as Schwartz argues, that "the issue of a defendant's state of mind *505 `does not readily lend itself to summary disposition.'" Maressa v. New Jersey Monthly, 89 N.J. 176, 197 n. 10, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982) (quoting Hutchinson v. Proxmire, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411, 422 (1979)).[2] However, strong countervailing policy considerations of constitutional dimension weigh heavily as well. Accordingly, our Supreme Court has encouraged the use of summary judgment practice in this context, finding it
particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern. By discouraging frivolous defamation actions, motions for summary judgment keep open lines of communication to the public on such issues.
Dairy Stores, supra, 104 N.J. at 157, 516 A.2d 220; see Maressa, supra, 89 N.J. at 196-98, 445 A.2d 376; Kotlikoff v. The Community News, 89 N.J. 62, 67, 444 A.2d 1086 (1982). Summary judgment in Worrall's favor is entirely appropriate here because Schwartz has not produced facts that a reasonable jury could find clearly and convincingly show that Worrall knew the statements were false, or had a high degree of awareness of their probable falsity, or entertained serious doubts about their truth.
Finally, we note that Schwartz's law firm separately seeks defamation damages. One of the bases for Worrall's motion for summary judgment was that the publication was not "of and concerning" the law firm. The firm was not mentioned in the article. It may have no cause of action. See Restatement § 562 cmt. b. We prefer, however, to rest our decision on another ground. It is that the status of Schwartz as a public *506 figure extends to his law firm in these circumstances, and therefore the reasons why Worrall was entitled to summary judgment against Schwartz apply equally to his law firm.
The order appealed from is reversed, and the matter is remanded for further proceedings not inconsistent herewith. Even though technically not appealed, the order granting plaintiffs partial summary judgment must be vacated as inconsistent herewith.
NOTES
[1] Cammelieri said he could not recall whether he had actually looked at the Schwartz story when Gatto placed the calls.
[2] We note that the Supreme Court harmonized its statement in Hutchinson with the formidable barrier to recovery it erected in Liberty Lobby by describing the statement as "an acknowledgement of our general reluctance `to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.'" Liberty Lobby, supra, 477 U.S. at 256 n. 7, 106 S.Ct. at 2514, 91 L.Ed.2d at 216 (quoting Calder v. Jones, 465 U.S. 783, 790-91, 104 S.Ct. 1482, 1487-88, 79 L.Ed.2d 804, 813 (1984)).