**Michel THOMAS, Plaintiff,**

v.

**LOS ANGELES TIMES COMMUNICATIONS, LLC, et al., Defendants.**

**No. CV 01–8684 ABC (MANx).**

United States District Court,
C.D. California.

Feb. 4, 2002.

---

Anthony Glassman, Glassman, Browning & Saltsman, Beverly Hills, CA, for Plaintiff.

Kelli Sager, Davis Wright Tremaine, Karlene Worthington Goller, Los Angeles Times, Alonzo Wickers IV, Jean-Paul Jassy, Davis Wright Tremaine LLP, Los Angeles, CA, for Defendants.

ORDER RE: DEFENDANTS' SPECIAL MOTION TO STRIKE PURSUANT TO CAL. CIV. PRO. CODE § 425.16; DEFENDANTS' REQUEST FOR ATTORNEYS' FEES AND COSTS PURSUANT TO CAL. CIV. PRO. § 425.16(c).

COLLINS, District Judge.

This case arises from an article appearing in the *Los Angeles Times* after the

publication of a biography about the life of Plaintiff Michel Thomas. Currently pending before the Court is Defendants' Special Motion to Strike the Complaint pursuant to California Code of Civil Procedure § 425.16. The Motion came on regularly for hearing before the Court on February 4, 2002. After consideration of the submissions of the parties and the case file, as well as the oral argument of counsel, the Court STRIKES Plaintiff's Complaint.

## I. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Plaintiff Michel Thomas alleges that he is a concentration camp survivor, a member of the French Resistance, a World War II veteran, and an agent of the United States Army Counter Intelligence Corps ("CIC") during World War II. Complaint ¶ 4. Thomas further alleges that, as part of his service with the CIC, he was present at the liberation of Dauchau, where he interrogated members of the crematorium staff; he personally obtained a letter of confession from Emil Mahl (the "Hangman of Dachau"); he was the first official of the Allied forces to discover the existence of Nazi documents in a paper mill near Munich, Germany; and he captured SS Major Knittel, a priority war criminal. *See id.* Thomas next alleges that, while he was a member of the French Resistance, he was interrogated by and escaped from Klaus Barbie, a Nazi Gestapo officer. *See id.* ¶ 5. Thomas currently owns and operates Michel Thomas Language Centers, schools that teach foreign language and English as a second language in New York City and Beverly Hills, California. *See id.* ¶ 6.

Thomas is the subject of a biography, *Test of Courage: The Michel Thomas Story,* authored by Christopher Robbins and published in the year 2000 by Free Press/Simon & Schuster. *See* Motion Ex. A. Robbins and Thomas are splitting the royalties from the biography. *See* Complaint Ex. A. On April 15, 2001, Defendant *Los Angeles Times* published an article about Thomas, titled "Larger Than Life" and authored by Defendant Roy Rivenburg, a staff writer. *See id.* ¶ 9 & Ex. A. The article, based on interviews with Thomas and others, addresses Thomas' claims that he was at the liberation of Dauchau as an American Army officer, that he found the Nazi documents, and that he has developed revolutionary teaching methods. *See id.*

On October 9, 2001, Thomas filed the instant lawsuit against Defendants, alleging that the April 15, 2001, article was defamatory. Specifically, he contends that the article contains six false and defamatory implications: (1) "that Thomas was not a member of and did not serve with the United States Counter Intelligence Corps ("CIC") during World War II;" (2) "that Thomas was not present at the liberation of Dachau;" (3) "that Thomas was not interrogated by and did not escape from Klaus Barbie, and that this testimony to that effect during Barbie's war crimes trial must therefore have been fabricated;" (4) "that Thomas did not discover and secure a vast amount of Nazi government documents and Nazi Party membership cards;" (5) "that Thomas has lied about, fabricated, and exaggerated events of his past;" and (6) "that Thomas' language teaching method is a sham and that the classes he offers are not worth the fee charged." *Id.* ¶ 10. He claims that the alleged defamatory implications were achieved through the use of linguistic devices and slanted words and phrases and the exclusion of numerous facts and documents. *See id.* ¶¶ 12–14.

On December 4, 2001, Defendants filed this Special Motion to Strike the Complaint pursuant to California Code of Civil Procedure § 425.16, noticed for hearing on February 4, 2002. Plaintiff filed his Oppo-

sition on January 14, 2002. Defendants filed a Reply on January 28, 2002.

## II. STANDARD FOR MOTION TO STRIKE

██ California Code of Civil Procedure § 425.16, commonly referred to as the "Anti–SLAPP"[1] statute, was enacted in 1993 "in response to the legislature's concern about civil actions aimed at private citizens to deter or punish them for exercising their political or legal rights." *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 970 (9th Cir.1999) (citing *Wilcox v. Superior Court*, 27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (1994)). "The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goal[ ] of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned . . . ." *Id.*

To combat the perceived threat of lawsuits filed merely to deter the exercise of political or legal rights, Section 425.16 sets up a "special motion to strike," that is akin to a Rule 12(b)(6) motion to dismiss. The Ninth Circuit has determined that the procedure set up by Section 425.16 applies to state law claims filed in federal court. *See id.* at 972–73 (applying Section 425.16 to state-law counterclaims).

██ "In order to prevail, a citizen party must make a prima facie showing that the SLAPP suit arises from any act by the citizen party 'in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue.'" *Id.* at 971. The Court makes this determination from the pleadings and supporting or opposing affidavits. Once this prima facie showing is made, the burden then shifts to the plaintiff to establish by a

"reasonable probability" that he or she will prevail on the claim and that the defendant's "purported constitutional defenses are not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." *See id.* (quoting *Wilcox*, 27 Cal.App.4th at 824–25, 33 Cal.Rptr.2d 446). The prevailing party on a special motion to strike is entitled to his or her attorneys' fees and costs. *See id.* (citing Section 425.16(c)).

## III. DISCUSSION

### A. Motion to Strike Pursuant to Code of Civil Procedure § 425.16

It is Defendants' initial burden to show that the claims in this case arose out of conduct "in furtherance of . . . free speech under the Constitution ⁚. . . in connection with a public issue." Cal. Civ. Pro.Code § 425.16(b); *Newsham*, 190 F.3d at 971. Plaintiff concedes that the anti-SLAPP statute applies to this action. *See* Opposition at 7:7–18. Accordingly, Defendants' burden to show this connection being met, it falls to Plaintiff to establish a "probability that [he] will prevail on the claim." Cal. Civ. Pro.Code § 425.16(b); *Newsham*, 190 F.3d at 971.

Defendants make three arguments in favor of their Motion to Strike: (1) that Thomas cannot prevail on a defamation by implication claim because he is a public figure; (2) that the article cannot reasonably be interpreted as giving rise to any of the defamatory implications identified in the Complaint; and (3) that the article is constitutionally protected.

#### 1. Is Thomas a public figure?

██ The first issue for the Court, because it affects the appropriate legal standard, is whether Thomas is a public figure.

---

1. "SLAPP" stands for "Strategic Lawsuit Against Public Participation."

Public figures must prove by clear and convincing evidence that an allegedly defamatory statement was made with knowledge of its falsity or in reckless disregard of its truth or falsity (known as "actual malice"). *See New York Times Co. v. Sullivan*, 376 U.S. 254, 296, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). " '[P]ublic figures are less deserving of protection than private persons because public figures . . . have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.' " *Copp v. Paxton*, 45 Cal.App.4th 829, 845, 52 Cal. Rptr.2d 831 (1996) (quoting *Reader's Digest Ass'n v. Superior Court*, 37 Cal.3d 244, 253, 208 Cal.Rptr. 137, 690 P.2d 610 (1984)) (internal quotation marks omitted). The question of whether a plaintiff is a public figure is a question for the Court, rather than the jury. *See id.* (quoting *Denney v. Lawrence*, 22 Cal.App.4th 927, 933, 27 Cal.Rptr.2d 556 (1994)).

■ Limited purpose public figures "lose some protection regarding their reputation 'to the extent that the allegedly defamatory communication relates to [their] role in a public controversy.' " *Rudnick v. McMillan*, 25 Cal.App.4th 1183, 1190, 31 Cal.Rptr.2d 193 (1994) (quoting *Reader's Digest*, 37 Cal.3d at 253–54, 208 Cal.Rptr. 137, 690 P.2d 610). "To qualify as a limited purpose public figure, a plaintiff 'must have undertaken some **voluntary** [affirmative] act[ion] through which he seeks to influence the resolution of the public issues involved.' " *Id.* (quoting *Reader's Digest*, 37 Cal.3d at 254, 208

Cal.Rptr. 137, 690 P.2d 610) (alterations and emphasis in *Rudnick* ).

■ The Complaint itself certainly supports a finding that Thomas is a public figure. *Cf. Nadel v. Regents of the Univ. of Calif.*, 28 Cal.App.4th 1251, 1270, 34 Cal.Rptr.2d 188 (1994) ("By Nadel's own account, [the public figure] characterization would certainly apply to him."). Thomas alleges that he has addressed the Anti–Defamation League and the Leo Baeck Institute in New York, that he has been interviewed on ABC's "Nightline" program in connection with his testimony in the Barbie trial, that he has been repeatedly quoted in the New York Times as a concentration camp survivor and CIC agent, and that he was profiled in a 1983 Los Angeles Times article that identified him as a CIC agent and Holocaust survivor. *See* Complaint ¶ 26. The Court finds that Plaintiff has acknowledged that he has thrust himself into the public controversy over disputed questions remaining from World War II.

Thomas has additionally been featured in numerous articles about his program for teaching foreign languages. *See* Motion Ex. E. These articles reveal a public controversy over the validity and effectiveness of Thomas' teaching methods.[2]

■ Perhaps most importantly, Thomas cooperated with Robbins in the publication of his biography, *Test of Courage. See* Motion Ex. A at x-xi. "Generally, authors are considered to have participated sufficiently in public controversies or otherwise involved themselves in matters of public concern as to be public figures." *Live Oak Publishing Co. v. Cohagan,* 234 Cal.App.3d

---

**2.** In *Vegod Corp. v. American Broadcasting Cos., Inc.*, 25 Cal.3d 763, 770, 160 Cal.Rptr. 97, 603 P.2d 14 (1979), the California Supreme Court held that "a person in the business world advertising his wares does not necessarily become part of an existing public

controversy." However, Thomas has gone beyond merely "advertising his wares." Rather, he is portrayed, and has portrayed himself, in numerous interviews as an expert in the field of language education. *See* Motion Ex. E. Accordingly, *Vegod* is inapposite.

1277, 1289, 286 Cal.Rptr. 198 (1991) (internal quotation omitted). Although Thomas was not himself the author of the book, the Court finds that his cooperation with its publication subjects him to becoming a public figure. The book addresses Thomas' alleged World War II activities and language teaching methods. *See id.* at ix-xi. By cooperating with the publication of the book, Thomas has invited public attention—and public scrutiny—to his life.[3] *Compare* Motion Exs. F & G (inviting Defendant Rivenburg to interview Thomas about the book) *with Rudnick,* 25 Cal. App.4th at 1190–91, 31 Cal.Rptr.2d 193 (finding that the plaintiff had "made himself into a limited purpose public figure" by inviting reporters to visit his ranch and write stories about him); *Denney v. Lawrence,* 22 Cal.App.4th 927, 935–36, 27 Cal. Rptr.2d 556 (1994) (finding that the plaintiff was a public figure because he had volunteered to give press interviews and promoted his own version of the events surrounding his sister-in-law's murder). Accordingly, at least with respect to his World War II participation and his teaching methods, the Court finds that Thomas is a public figure. As a limited purpose public figure, he must show "actual malice" to prevail on a defamation claim.

> *2. As a public figure, can Thomas state a defamation by implication claim?*

Defendants next argue that, as a public figure, Thomas cannot prevail on his defamation claim because it is based only on implications, not statements of facts. *See Fitzgerald v. Tucker,* 737 So.2d 706, 717 (La.1999); *Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 477 A.2d 1005, 1010 (1984); *Pietrafeso v. D.P.I., Inc.,* 757 P.2d 1113, 1116 (Colo.Ct.App.1988); *DeFalco v. Anderson,* 209 N.J.Super. 99, 506 A.2d 1280, 1284 (App.1986); *Mihalik v. Duprey,* 11 Mass.App.Ct. 602, 417 N.E.2d 1238, 1241 (1981). These decisions have held that the rule that public figures cannot state a claim for defamation by implication "is a corollary to the privilege accorded false statements concerning public officials [or public figures] without malice." *Strada,* 477 A.2d at 1012.

However, neither the California courts nor the Ninth Circuit have ever held that a public figure cannot state a claim by defamation for implication. *See, e.g., MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 343 P.2d 36 (1959) (applying actual malice standard to claim that report implied that the plaintiff was a Communist sympathizer); *Partington v. Bugliosi,* 56 F.3d 1147, 1152 (9th Cir.1995) ("we do not determine whether the fact that Partington's claim regarding passages in the book rests upon the **implication** arising from the statements, rather than their actual content, would affect the showing that Partington is required to make"). The Court declines to do so here, in the absence of controlling authority, and concludes that Thomas' status as a public figure is not a per se bar to his defamation by implication claim. Nevertheless, the Court is mindful of the "leeway for criticism" of public figures, including for "implications deprecatory to plaintiff ...." *Okun v. Superior Court,* 29 Cal.3d 442, 450, 175 Cal.Rptr. 157, 629 P.2d 1369 (1981).

> *3. Has Thomas shown a probability that he will prevail?*

"To constitute a libel it is not necessary that there be a direct and spe-

---

**3.** The California Supreme Court's decision in *Khawar v. Globe Int'l, Inc.,* 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 965 P.2d 696 (1998), is distinguishable. Unlike Thomas, the plaintiff in *Khawar* "did not engage in conduct that was calculated to draw attention to himself ...." *Id.* at 267, 79 Cal.Rptr.2d 178, 965 P.2d 696 (internal quotation marks omitted).

cific allegation of improper conduct .... The charge may be either expressly stated or implied ...." *MacLeod*, 52 Cal.2d at 548–49, 343 P.2d 36 (internal quotation marks and citation omitted). When addressing a defamation by implication claim, the Court "must determine whether the statements that form the basis of a defamation claim: (1) ... impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor is such that it cannot 'reasonably be interpreted as stating actual facts.'" *Weller v. American Broadcasting Cos., Inc.*, 232 Cal.App.3d 991, 1001, 283 Cal.Rptr. 644 (1991) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)) (alteration omitted).

▇▇▇▇▇ Defendants first contend that the article cannot reasonably be read as giving rise to the allegedly defamatory implications identified by Plaintiff. Thomas "must show that the words [Rivenburg wrote] were reasonably capable of sustaining [the alleged defamatory] meaning. More important, he must show that a jury could reasonably find by clear and convincing evidence that [Defendants] 'intended to convey the defamatory impression.'" *Dodds v. American Broadcasting Co., Inc.*, 145 F.3d 1053, 1063–64 (9th Cir.1998) (quoting *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 681 (9th Cir.1990)). "[T]his court's inquiry is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning." *Forsher v. Bu-*

*gliosi*, 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716 (1980).

▇▇▇ The Court agrees with Defendants that the allegation that the article implies that Thomas has lied about his past subsumes the allegations that the article implies that he was not a member of the CIC, was not present at the liberation of Dachau, did not escape from Klaus Barbie, and did not discover a cache of Nazi documents. There is nothing defamatory about the alleged implications that he was not active in World War II unless accompanied by an implication that he had lied about those activities. The Court assumes, *arguendo*, that implications that Thomas has lied about his past and that his language classes are "a sham" would be defamatory.

A reasonable reader or juror might conclude, after reading the article and considering the various points of view presented, that Thomas had in fact lied about his past. But no reasonable juror could find that Defendants intended to convey that impression. At most, a reasonable juror would find that Defendants intended to raise questions about Thomas' story.[4] *Cf. Okun v. Superior Court*, 29 Cal.3d 442, 452, 175 Cal.Rptr. 157, 629 P.2d 1369 (1981) ("The letter's apparent aim ... was to disclose whatever pertinent facts were known to the writer.").

The article raises these questions by setting forth Plaintiff's version of events along with those of other witnesses and historical records.[5] With regard to the alleged implication that Thomas did not

---

**4.** At oral argument, Plaintiff's counsel raised the question of whether the Court had impermissibly weighed the evidence presented in reaching this conclusion. The Court has not weighed the evidence, but rather reaches this conclusion as a matter of law.

**5.** The Court therefore concludes that *Weller* is distinguishable. There, the court stated that

"appellants' characterization of the series of broadcasts as consistently and accurately presenting both sides of the story ... is not supported by the record." 232 Cal.App.3d at 1004 n. 11, 283 Cal.Rptr. 644. The Court finds that Rivenburg did present both sides of Thomas' stories and left room for the reader to form his own opinion.

serve with the CIC, the article states that the Pentagon was unable to verify Thomas' military service, but explains that a 1973 fire destroyed some personnel files. *See* Complaint Ex. A. The article also raises the possibility with Thomas served with the CIC as a civilian employee. *See id.* As a civilian employee could be considered to have been a "member" of or "served with" the CIC, the Court finds that Rivenburg did not intend to convey an implication that Thomas lied about his military service. With regard to the alleged implication that Thomas was not present at the liberation of Dachau, the article merely compares Thomas' account with other eyewitness reports. *See id.* The article attributes to Robbins, not Thomas, the confusion over which unit Thomas was with. *See id.* With regard to whether Thomas was interrogated by and escaped from Klaus Barbie, the article merely reports multiple accounts of Thomas' testimony. *See id.* Lastly, with regard to the alleged implication that Thomas did not discover a cache of Nazi documents, the article states that another individual was given credit for the discovery in a 1945 press conference, but quotes Robbins as saying that he has seen the documents that Thomas discover-

ed. *See id.* Although the article does suggest that Rivenburg is skeptical about Thomas' life story, it does not conclude definitively either that Thomas has told the truth or lied. It would be clear to a reader that the skepticism is Rivenburg's own opinion and is based on the facts presented. *Cf. Partington,* 56 F.3d at 1156–57 ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").[6]

For similar reasons, the article cannot be read to suggest that Defendants intended to imply that Thomas' language classes are a sham. The article raises questions about the validity of Thomas' teaching methods and leaves the reader free to draw his own conclusion.[7] For example, the article quotes both individuals who have seen Thomas' teaching method succeed and fail. *See* Complaint Ex. A.[8] For the foregoing reasons, Plaintiff's claim must be stricken because he has not shown that he has a probability of proving that Defendants intended to convey a defamatory impression.

**6.** At oral argument, Plaintiff's counsel detailed for the Court the evidence supporting Plaintiff's story that was available to Rivenburg but was not included in the article. No case has ever held that an author is required to include all the information uncovered in his research. In fact, given the space limitations of a newspaper, it is unlikely that any article could include all of the author's research. And it is not the Court's role to serve as the editor of the article, determining what additional information should or should not have been included.

**7.** The declarations submitted by Thomas do not dissuade the Court. *See* Decl. of Christopher Robbins at ¶¶ 4–8; Decl. of Michel Thomas at ¶¶ 63–71; Decl. of Herbert Morris at ¶¶ 3–7. These declarations merely reveal a reporter doing his job—asking tough ques-

tions. *See* Thomas Decl. ¶ 66 ("Rivenburg would insist that I provide ever-finer levels of detail."). In fact, Professor Morris has declared that, in his interview with Defendant Rivenburg, "it became clear to me ... that the forthcoming Article would be skeptical in character and that it would in all likelihood call into question the truthfulness of a number of Michel Thomas' claims about his World War II experiences." Morris Decl. ¶ 3. There is nothing impermissible about Rivenburg's alleged intention to raise questions about Thomas' story.

**8.** The Court also finds that no reasonable juror could conclude from reading the article that the language classes are a sham. Rivenburg apparently has not experienced the classes, and the article has a much less skeptical tone.

More significantly, the Court also finds that even if Defendants did intend to assert the allegedly defamatory implications, the article itself is constitutionally protected because it merely states "opinion[s] on matters of public concern that do not constitute or imply a provable factual assertion." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir.1995) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). The Court applies a three-step analysis to determine whether the article implies a provable factual assertion:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Id.* (citing *Partington*, 56 F.3d at 1153).[9] Throughout this analysis, the Court finds the Ninth Circuit's decision in *Partington* to be particularly helpful. There, the court cautioned that "the First Amendment guarantees authors 'the interpretive license that is necessary when relying upon ambiguous sources.'" *Partington*, 56 F.3d at 1154 (quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 519, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)). In *Partington*, as well as this case,

[the author] can only be said to have expressed his own opinion after having outlined all of the facts that serve as the basis for his conclusion .... "[B]ecause the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation."

*Id.* at 1156 (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C.Cir. 1994)).

### a. The broad context of the article

First, the broad context of the work supports a finding of constitutional protection. Although there is no per se protection for book reviews, "when a reviewer offers commentary that is tied to the work being reviewed, and that is a supportable interpretation of the author's work, that interpretation does not present a verifiable issue of fact that can be actionable in defamation." *Moldea*, 22 F.3d at 313. Rivenburg's article refers repeatedly to Robbins' biography of Thomas, but the Court cannot find that the article is truly a book review. The article is not critical so much of Robbins' research and writing as the underlying story itself. Nevertheless, the Court finds that the article is "a rational assessment or account of something the reviewer can point to **in the text**, or **omitted from the text**." *Id.* at 315 (emphasis in original). That is, the article is Rivenburg's account of historical research omitted from the text. Accordingly, the article is deserving of protection similar to that accorded a book review.

Additionally, the article is not the type of "apparently objective and neutral reporting ... almost certain to be under-

---

9. The Court finds the declarations submitted by Plaintiff to be unhelpful. "[T]he publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." *MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536, 547, 343 P.2d 36 (1959). Plaintiff's expert declarants may not be trained in the law, but neither should they be considered "average readers."

stood as factual." *Weller*, 232 Cal.App.3d at 1004, 283 Cal.Rptr. 644. The article appeared in the feature section of the *Los Angeles Times* and is written in an almost conversational tone. It would be obvious to the average reader that the article is intended to be commentary, rather than a hard-hitting investigative report (as was the case in *Weller*).

Finally, the article explicitly states that its purpose is to "compare[ ] several of Thomas' accounts of his role in historic events with other records and recollections." Complaint Ex. A. The Court agrees with the Fourth Circuit that:

> "the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts. Nor do they necessarily insinuate derogatory answers. They may simply be, as they are here, expressions of uncertainty. The ... article advances alternative answers to the questions it raises ...."

*Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir.1993) (quoting *Chapin v. Greve*, 787 F.Supp. 557, 567–58 (E.D.Va. 1992)). Even if Rivenburg's opinion is that Thomas lied and that opinion comes through in the article, that opinion is clearly based on a consideration of both sides of the story. If the opinion is based on disclosed facts, it is not actionable. *See Cochran v. NYP Holdings, Inc.*, 58 F.Supp.2d 1113, 1123 (C.D.Cal.1998) ("Because the factual referent is disclosed, 'readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' ") (quoting *Standing Comm'ee v. Yagman*, 55 F.3d

1430, 1439 (9th Cir.1995)), *aff'd* 210 F.3d 1036 (9th Cir.2000).

#### b. *The specific context of the article*

■ Second, the specific context of the article also supports a finding that the article is constitutionally protected. Plaintiff takes issue with certain linguistic and rhetorical devices used in the article. *See* Complaint ¶ 4. These "slanted words," "personal ridicule," and use of "irony," however, all take the article out of the realm of fact.[10] "[T]he language [is] colorful, figurative rhetoric that reasonable minds would not take to be factual." *Underwager*, 69 F.3d at 367. Rivenburg's language, such as "wild tales" and "sporting a pompadour of unknown origin," is virtually indistinguishable from the colorful phrasing approved in *Underwager*. *See id.* (approving use of the phrases "looking at greener pastures" and "must have trouble sleeping"). Rivenburg's "stylistic clash" and "tongue-in-cheek commentary," Complaint ¶ 12, create the conversational style that makes clear that the article is protected opinion. *See Partington*, 56 F.3d at 1157 ("[T]he First Amendment protects the 'rhetorical hyperbole' and 'imaginative expression' that enlivens writers' prose.") (quoting *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695).

#### c. *Whether the implications are provably false*

■ Third, as to the question of whether the implications are provably false, the article reveals that there is conflicting information on each of the implications. *Cf. Partington*, 56 F.3d at 1154 ("There is no question that the subject matter of the book, and the sources upon which Bugliosi relies in drawing his conclusions, are in-

---

10. At this stage, the Court cannot resolve Plaintiff's allegation that Rivenburg relied on "fabricated and/or out of context quotations." Complaint ¶ 12. But the Court is inclined to conclude that Plaintiff's allegations show, at most, that the alleged implications are not necessarily provable.

herently ambiguous, and we believe that reasonable minds could differ as to how to interpret the events and actions described in it."). The Court recognizes that the historical record can be inherently ambiguous. Additionally, the alleged implications are the types of statements that courts have repeatedly found not to be provably false. *See, e.g., Underwager,* 69 F.3d at 367 (finding that an accusation that the plaintiff lied is not defamatory because "the term 'lying' applies to a spectrum of untruths including 'white lies,' 'partial truths,' 'misinterpretation,' and 'deception' "); *Dodds,* 145 F.3d at 1066 (finding that questions of value are "largely subjective"); *Gray v. St. Martin's Press, Inc.,* 221 F.3d 243, 249 (1st Cir.2000) (finding that "subjective characterization[s] of what happened" are protected). For these reasons, the Court finds that no statements in the article are provably false.

In sum, by cooperating in the publication of his biography, Thomas " 'invited attention and comment . . . . [I]t was . . . properly an invitation to investigate and question. That's all [Rivenburg] did.' " *Chapin,* 993 F.2d at 1098 (quoting *Chapin,* 787 F.Supp. at 567–68). Therefore, the Court finds that Plaintiff has not shown a probability of success on his defamation claims and the Complaint must be struck under Section 425.16.

Finally, because the allegedly defamatory implications are not actionable, there is no need for the Court to consider whether Plaintiff has made a showing of actual malice. Nevertheless, the Court observes that "any failures or omissions in [Rivenburg's] conduct . . . fell far short of that required to establish that [he] acted with reckless disregard for the truth." *Dodds v. American Broadcasting Co., Inc.,* 145 F.3d 1053, 1063 (9th Cir.1998). Even if

Rivenburg "could have done a more thorough and responsible job in general in determining the facts . . . [,] [t]hat . . . is not the test for determining whether the network acted with actual malice . . . ." *Id.*

## B. Attorneys' Fees and Costs Under Section 425.16(c)

The attorneys' fees provision of Section 425.16 also applies in federal court, and declares that an award of attorneys' fees to a moving party is mandatory if a special motion to strike is granted. *See* Cal. Civ. Pro.Code § 425.16(c) ("a prevailing party [ordinarily a defendant, but plaintiff in this case] on a special motion to strike *shall* be entitled to recover his or her attorneys' fees and costs") (emphasis added). Defendants are the "prevailing party."

 Defendants have not yet filed a Motion for Attorneys' Fees incurred in moving to strike the state law counterclaims. *See* Notice of Motion at 5 n. 8. Defendants may timely file such a motion pursuant to the authority of Section 425.16(c) and Local Rule 54–12.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Strike the Complaint.[11] The Court also declares Defendants to be the "prevailing party" pursuant to California Code of Civil Procedure § 425.16 and thereby to be entitled to fees and costs incurred in striking the non-meritorious Complaint.

---

11. The Court agrees with Defendants that Plaintiff may not amend his Complaint after it is stricken pursuant to California Code of Civil Procedure § 425.16. *See Simmons v. Allstate Ins. Co.,* 92 Cal.App.4th 1068, 1073–74, 112 Cal.Rptr.2d 397 (2001).