[No. S018076. Dec. 31, 1992.]

FREEDOM NEWSPAPERS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
B. RICHARD GOULD, as Executor, etc., Real Party in Interest.

**COUNSEL**

Helsing & Wray, Duffern H. Helsing, Halina F. Osinski and George D. Straggas for Petitioners.

No appearance for Respondent.

Jones, Day, Reavis & Pogue and H. Warren Siegel for Real Party in Interest.

**OPINION**

**GEORGE, J.**—Civil Code section 48a, subdivision 1 (hereafter section 48a(1)), limits the plaintiff in an "action for damages for the publication of a libel in a newspaper" to the recovery of special damages unless, within 20 days after becoming aware of the alleged libel, the plaintiff "serve[d] upon the *publisher*, at the place of publication . . . , a written notice specifying the statements claimed to be libelous and demanding that the same be corrected" (italics added), and the publisher failed to correct the error.

In this case, the required notice was served on the editor of the newspaper in which the allegedly libelous statements appeared. For the reasons that follow, we hold that although the notice in the present case was sent to the editor of the newspaper, rather than to the publisher, the allegations in the second amended complaint that the editor had been designated by the publisher to receive such notices, and that the publisher acquired actual knowledge of the notice within the time period specified in section 48a(1), are sufficient, if proved, to satisfy the requirement of section 48a(1) that the notice be served upon the publisher.

## FACTS

Calvin Schmidt,[1] a municipal court judge, filed a libel action against Freedom Newspapers, Inc., and related defendants (hereafter defendants). Schmidt's second amended complaint alleges that the Orange County Register, which is published by Freedom Newspapers, Inc., published articles that stated falsely "that Judge Schmidt rendered favorable decisions in return for sexual favors from prostitutes." These articles were published on October 9, 1988, December 14, 1988, and March 9, 1989. On March 13, 1989, Schmidt sent a letter to the editor of the Orange County Register, N. Christian Anderson, demanding a correction of the March 9, 1989, article. A copy of the letter was attached to the second amended complaint as exhibit "A." The second amended complaint alleges that no correction was printed.

The second amended complaint further alleges "that although addressed to the editor, Exhibit 'A' was known to the publisher of the newspaper at or about the time it was written [and that] the editor of The Register, N. Christian Anderson, had actual authority by delegation from the publisher, or by a pattern or practice developed over a period of years, to determine on behalf of The Register whether and how to respond to requests for corrections such as Exhibit 'A', and to make corrections if he determines to do so."

Schmidt sought "general damages and special damages in an amount to be determined by proof at trial, but at least $200,000.00," as well as punitive damages.

Defendants moved to strike the prayer for general and punitive damages on the ground, among others, that Schmidt's demand for correction failed to

---

[1]Calvin Schmidt died during the pendency of proceedings before this court. We granted the motion of the executor of Schmidt's estate to be substituted as real party in interest. (Code Civ. Proc., former § 385; *Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128, 1133 [277 Cal.Rptr. 354].) It is settled that the cause of action for libel survives Schmidt. (Prob. Code, former § 573, subds. (a), (c); cf. *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920, fn. 3 [148 Cal.Rptr. 389, 582 P.2d 980]; *Urbaniak v. Newton, supra,* 226 Cal.App.3d 1128, 1142.)

comply with the requirement of section 48a(1) that the notice be served upon the publisher. The superior court denied the motion to strike, and defendants sought a writ of mandate from the Court of Appeal. The Court of Appeal granted the requested relief, ordering that a peremptory writ of mandate issue directing the superior court to vacate its order denying defendants' motion to strike and to enter a new order granting the motion. We granted Schmidt's petition for review.

## DISCUSSION

This court previously has interpreted section 48a. In *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 113 [77 Cal.Rptr. 243, 453 P.2d 747], we held that this statute protects persons "engaged in the news dissemination industry" and not "third parties" whose allegedly defamatory statements were published by the news media. ■ In so holding, we stated that the term " 'publisher,' " as used in section 48a(1), "clearly refers to the owner or operator of the newspaper . . . , rather than the originator of the defamatory statements. [Citation.]" (71 Cal.2d at p. 114; see also *Pridonoff* v. *Balokovich* (1951) 36 Cal.2d 788, 791 [228 P.2d 6].) We observed: "[I]t is only the publisher . . . who has the power effectively to correct or retract. When a defamatory statement authored by a participant in a publishing or broadcasting enterprise has been published by a newspaper or broadcasting station, it is largely the authority and reputation of the paper or station that gives the statement its credibility." (71 Cal.2d at p. 115.)

Interpreting the term "publisher" to refer to the owner or operator of the newspaper comports with our mandate to construe statutory language according to "its usual, ordinary import." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) The term "publisher" customarily is defined as "a person or corporation whose business is the publication of books, periodicals, music, maps, and the like." (Webster's New Internat. Dict. (2d ed. 1948) p. 2006.) A newspaper's editor does not come within this definition. The term "editor" generally is defined as "[o]ne who directs or supervises the policies and contributions of a newspaper." (*Id.* at p. 817.) An editor exercises control over the content of a newspaper but does not publish the newspaper. An editor's authority is derived from the publisher.

In the context of defamation actions, the term "publisher" can be defined as a person or entity that communicates to a third person a defamatory statement about another. As the court explained in *Field Research Corp.*, however, it is clear from a consideration of the statute as a whole that in drafting the portion of section 48a here at issue, the Legislature did not

employ the term "publisher" in this technical, legal sense, but rather according to its common meaning: the owner or operator of a newspaper. We stated in this regard: "Although the word 'publication' in the first sentence of [section 48a(1)] is used in its legal sense to mean the communication of any defamation [footnote omitted], the second sentence provides that the demand for correction shall be served upon the 'publisher' or 'broadcaster' and clearly refers to the owner or operator of the newspaper or radio station, rather than the originator of the defamatory statements. [Citation.]" (*Field Research Corp.* v. *Superior Court, supra*, 71 Cal.2d at p. 114; cf. *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 341 [41 L.Ed.2d 789, 806, 94 S.Ct. 2997]; *Wheeler* v. *Green* (1979) 286 Ore. 99 [593 P.2d 777, 791].)

It is true that service of the required notice on the editor of a newspaper would go far toward accomplishing the purpose designed to be served by section 48a(1), namely to bring promptly the alleged libel to the newspaper's attention to facilitate the newspaper's "investigative efforts in determining whether the statements in the initial article contained error and should be corrected." (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 30-31 [81 Cal.Rptr. 360, 459 P.2d 912].) But it is the prerogative of the Legislature to determine the means to be employed in accomplishing a legislative goal, and section 48a(1) specifies that the notice is to be served upon the "publisher" of the newspaper. The Legislature may well have phrased section 48a(1) in the manner it did because the publisher, rather than a subordinate employee, is most likely to have the greater interest in protecting the newspaper from a libel judgment.

In the present case, the second amended complaint alleges that Schmidt sent a letter to the editor of the newspaper in which the offending material appeared, demanding a correction of the allegedly libelous statements. Schmidt further alleged "that although addressed to the editor, [the notice] was known to the publisher of the newspaper at or about the time it was written . . ." and the publisher had delegated to the editor the authority to respond to the notice. ■ For the reasons that follow, we hold that these allegations, if proved, are sufficient to establish that the notice was served upon the publisher within the meaning of section 48a(1).

In *Kapellas* v. *Kofman, supra*, 1 Cal.3d 20, 31, we discussed the required contents of a section 48a(1) notice, observing: "[L]etters written to request retraction of a statement do not compose formal legal complaints; we cannot expect that they will conform to the niceties of common law pleading. In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; it did not intend to build technical barricades to recovery by the individual who

had given notice sufficient to advise a reasonable publisher acting in good faith of the claimed error. The crucial issue in evaluating the adequacy of the notice turns on whether the publisher should reasonably have comprehended which statements plaintiff protested and wished corrected. [Citation.]"

By parity of reasoning, the requirement of section 48a(1) that the plaintiff "serve" the notice upon the publisher was not intended to impose a technical barrier to recovery when the purposes designed to be served by section 48a are satisfied.[2] Therefore, we hold that the requirements of section 48a(1) are satisfied when the demand for correction is (1) served upon the publisher, (2) served upon a person designated by the publisher to receive such notices, or (3) served upon someone employed at the newspaper other than the publisher or the publisher's designee *and* the publisher acquires *actual* knowledge of the request for correction within the time limit set forth in the statute. Such a rule is consistent with both the language of the statute and the policy it was designed to serve.[3]

In the present case, Schmidt alleged that, although he addressed the section 48a(1) notice to the editor of the newspaper that published the allegedly libelous statements, the notice "was known to the publisher of the newspaper at or about the time it was written. . . ." In addition, Schmidt alleged that the editor "had actual authority by delegation from the publisher, or by a pattern or practice developed over a period of years, to determine . . . whether and how to respond to requests for corrections . . . ." These allegations, if proved, are sufficient to establish service of the demand for correction upon the publisher within the meaning of section 48a(1). Accordingly, we hold that the superior court properly denied the motion to strike Schmidt's prayer for general and punitive damages, and that the Court of Appeal erred in ordering the issuance of a peremptory writ of mandate directing the superior court to enter an order granting the motion to strike. The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with the views expressed in this opinion.

---

[2]For this reason, we reject defendants' argument that the required notice must be sent by registered mail. Defendants rely on Code of Civil Procedure section 1020, which states, in pertinent part, that "[a]ny notice required by law . . . may be given by sending the same by registered mail . . . ." By its terms, this statute is permissive only. It does not require that a notice which may be served by mail be sent by registered mail. (Code Civ. Proc., § 1012 et seq.) Any suggestion to the contrary in *San Leandro Collection Service* v. *Dunbar* (1968) 259 Cal.App.2d Supp. 933, 935 [66 Cal.Rptr. 495], is disapproved.

[3]We recognize that there may be circumstances in which a newspaper is estopped to deny that the notice given is sufficient, but we need not, and do not, address in this case the issue of estoppel, because it is not raised on the facts before us.

Real party in interest, the executor of Schmidt's estate, shall recover his costs on appeal.

Mosk, J., Panelli, J., Arabian, J., and Baxter, J. concurred.

**KENNARD, J., Concurring.**—I agree with the majority's conclusion that the trial court correctly denied the motion to strike plaintiff's prayer for general and punitive damages. I do not, however, agree with the majority's construction of the controlling statute.

Under Civil Code section 48a, subdivision 1 (hereafter section 48a(1)), a plaintiff who sues a newspaper for allegedly defamatory statements may recover only special damages, unless within 20 days of knowledge of those statements the plaintiff "serve[s] upon the publisher" a demand for correction. Thus, such a demand is a prerequisite to the recovery of general or punitive damages. The issue here is whether this statutory requirement was satisfied when plaintiff mailed the correction demand to the newspaper's editor.

According to the majority, the word "publisher" is unambiguous and does not include the newspaper's editor, although service can be made on a variety of people in any number of ways. The majority concludes that in this case the parties must litigate whether the demand for correction was known to the publisher at or about the time it was written, whether the editor had actual authority by delegation from the publisher to respond to requests for corrections, and whether the editor had such authority based on a pattern or practice developed over a period of years.

Contrary to the majority's assertion, it is not at all clear from the statutory language what the word "publisher" means. It is, however, clear what the word "serve" means. To best effectuate the statutory purpose, the word "publisher" as used in section 48a(1) should be construed to include the owner of a newspaper, the person designated by the newspaper as its publisher, and the newspaper's principal editor. And the word "serve" should be given its usual, ordinary meaning, that is, the delivery of a document, personally or by mail.

I.

Under section 48a(1), a demand for correction, served upon the "publisher," is a prerequisite to the recovery of general or punitive damages in an action for libel. The statute provides: "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast,

plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the *publisher*, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous." (Italics added.)[1]

According to the majority, the word "publisher" means the owner or operator of the newspaper. (Maj. opn., *ante,* p. 656.) The majority then states that the editor of a newspaper is not within its definition. (*Ibid.*) The majority incorrectly assumes—as evidenced by its failure to even address the question of whether the editor is the operator of a newspaper—that the word "publisher" is unambiguous. But that word, as used in the phrase "serve upon the publisher," *is* ambiguous; there are four different possible meanings that can be ascribed to it.

First, "publisher" can mean a person or an entity that is the owner of a newspaper. (*Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 114 [77 Cal.Rptr. 243, 453 P.2d 747] [hereafter *Field Research*]; see Webster's New Internat. Dict. (2d ed. 1942) p. 2006, col. 1.) Second, "publisher" can mean someone who, even though not the owner, is given the title of publisher by the newspaper. For instance, in this case the Orange County Register has identified in its brief an individual, R. David Threshie, as its "publisher." The newspaper is owned, however, by a corporation, Freedom Newspapers, Inc. Third, "publisher" can also mean the person who operates a newspaper in the sense of controlling its content and operations. (See *Field Research, supra,* 71 Cal.2d at pp. 114-115.) The term is susceptible of yet a fourth meaning; used in its technical legal sense, "publisher" means someone who communicates a defamatory statement about another to a third person. (See Rest.2d Torts, § 578, com. d; Prosser & Keeton on Torts (5th ed. 1984) § 113, pp. 799, 803; *Field Research, supra,* at p. 114 [person who communicates statement not a "publisher" for purposes of section 48a(1)].)

Because it is not at all clear from the statutory language which of these meanings of the word "publisher" the Legislature intended, we must, consistent with basic principles of statutory construction, turn to extrinsic aids to ascertain the Legislature's purpose in enacting the statute. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

---

[1] Section 48a, subdivision 2 allows recovery of exemplary or punitive damages only if the plaintiff proves that the publication was made with actual malice. Subdivision 4(c) defines exemplary damages as damages that may be recovered in addition to general and special damages for sake of example and by way of punishing the defendant. Subdivision 4(d) defines actual malice as a state of mind arising from hatred or ill will.

## II.

The objective of statutory construction is to ascertain and effectuate legislative intent. (*Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455]; *People* v. *Woodhead, supra,* 43 Cal.3d at p. 1007.)

As noted earlier, under section 48a(1), which was enacted in 1931, a plaintiff suing for defamation cannot recover anything beyond "special damages" absent a prior demand on the "publisher" to correct or retract the allegedly defamatory material.[2] This was "a significant change from common law libel, which at one time permitted a plaintiff libelled even by an innocent misstatement to recover general damages without proving actual injury." (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 30 [81 Cal.Rptr. 360, 459 P.2d 912], fn. omitted.)

Through the demand for correction of the specific statements objected to, the Legislature sought to narrow, and thereby facilitate, the newspaper's investigation in determining whether the statements being challenged were inaccurate and should be corrected. (*Kapellas* v. *Kofman, supra,* 1 Cal.3d at pp. 30-31.) "In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; . . ." (*Id.* at p. 31.) This, in turn, was expected to "encourage a more active press by means of an increased insulation of newspapers from liability arising from erroneous published statements." (*Id.* at p. 30.) Thus, protection of the public interest in the free and rapid dissemination of news was the major objective underlying the Legislature's enactment of section 48a. (*Field Research, supra,* 71 Cal.2d at p. 115; *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 128 [216 P.2d 825, 13 A.L.R.2d 252].)

This statutory purpose requires that the protection of section 48a(1) be extended to all persons who are engaged in the newspaper enterprise, "including reporters, columnists, authors, critics, and editors." (*Field Research, supra,* 71 Cal.2d at p. 114.) "Otherwise, that section would protect, not those engaged in the rapid dissemination of news, but merely those who owned or operated the facilities for such dissemination; it would protect, not a special form of news reporting, but a special form of investment. If without first demanding and being refused a retraction, plaintiffs could reach behind the publisher or broadcaster and sue instead the offending reporter or other participant, section [48a(1)] would serve little purpose and would actively

---

[2]Section 48a, subdivision 4(b) defines "special damages" as "all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." In 1945, section 48a was amended to extend its protection to broadcasters. (Stats. 1945, ch. 1489, § 5, p. 2763.)

discourage the very free and rapid dissemination of news it seeks to encourage." (*Id.* at pp. 114-115.)

Although section 48a(1) spreads a broad mantle of protection over those engaged in the business of news dissemination, the class of persons who may effectively be served with a correction demand is more limited. Once again, this court's opinion in *Field Research* is instructive: "[T]here is good reason for [section 48a(1)] to designate the publisher or broadcaster as the party on whom notice to retract must be served. [Citations.] With respect to the defamations that their employees or other participants have caused to be published or broadcast, *it is only the publisher or broadcaster who has the power effectively to correct or retract.* When a defamatory statement authored by a participant in a publishing or broadcast enterprise has been published by a newspaper or broadcasting station, it is largely the authority and reputation of the paper or station that gives the statement its credibility. Indeed, many news stories . . . do not reveal the identity of the author and are accepted by the public as statements of the enterprise itself. Even when the participant is identified, the weight that the public will attach to his [or her] statement may be determined largely by the reputation for truth and impartiality that the enterprise itself enjoys." (*Field Research, supra,* 71 Cal.2d at p. 115, italics added.)

As this statement from *Field Research* reveals, the term "publisher" as used in section 48a(1) refers to the one or more persons or entities within the newspaper enterprise vested with authority "effectively to correct or retract" —that is, those persons or entities with sufficient authority to direct a correction on behalf of the newspaper enterprise itself.

Obviously, the newspaper's owner, as the person or entity with the legal right to control (see Black's Law Dict. (6th ed. 1990) p. 1105, col. 2), "has the power effectively to correct or retract" erroneous statements in a previously published article. But the owner may not be the only one having this power. Thus, as this court said in *Field Research,* the term "publisher" as used in section 48a(1) refers not only to the owner, but also to the operator of the newspaper. (71 Cal.2d at p. 114.) Here, for example, the brief submitted by the corporate owner of the newspaper states that its "publisher" is an individual. It is reasonable to infer that an individual who has been given the title of publisher by the newspaper's owner has also been vested with authority to make corrections for the newspaper.

To construe "publisher" as meaning only the owner of a newspaper would set a trap for the unwary, because newspaper mastheads often list an individual other than the owner as the newspaper's publisher. When this

occurs, a person attempting reasonably and in good faith to comply with section 48a(1) is likely to serve the demand for correction on the individual so designated. To permit the newspaper's owner to defend on the ground that service was made on the wrong person would be grossly unfair. Accordingly, when a newspaper publicly designates an individual as its publisher, service on that individual is service on the "publisher" within the meaning of section 48a(1), regardless of the actual authority of that individual.

In this case, it is undisputed that plaintiff served the demand for correction on a person who was neither the owner of the newspaper, nor someone designated by the owner as the newspaper's publisher; instead, the demand was made on the editor. Is the service requirement of section 48a(1) satisfied by serving a demand for correction on the editor?

An editor is one who "prepares the work of another for publication," who "directs and supervises the policies and contributions of a newspaper," or who "has editorial supervision of part or a special department or feature of a publication." (Webster's New Internat. Dict., *supra*, p. 817, col. 3.) Thus, editors are directly concerned with the text of the matter published, and at least some editors can set policy and determine whether a particular text is to be printed or not.

Newspapers frequently have several individuals with the title of editor. In addition to a principal editor or editor-in-chief, newspapers may have, for example, a city editor, associate editors, and editors of various features or departments. But editors other than the principal editor or editor-in-chief may not have authority to make corrections for the newspaper as a whole. Even within their own area of responsibility, these subordinate editors can be overruled by the principal editor, who bears the greatest responsibility among a newspaper's editors for the newspaper's overall reputation for truth and impartiality. Because subordinate or specialized editors may lack "the power effectively to correct or retract" on behalf of the enterprise (*Field Research*, *supra*, 71 Cal.2d at p. 115), I would hold that service on such individuals does not satisfy the requirements of section 48a(1).

On the other hand, a principal editor or editor-in-chief of a newspaper would have overall responsibility for the accuracy and fairness of the material the newspaper publishes. Service of a demand for correction on such an individual is consistent with the statutory purpose because it places the demand in the hands of someone with the power to act on it. Thus, I would conclude that service of a demand for correction on a newspaper's principal editor is service on the "publisher" within the meaning of section 48a(1).

It necessarily follows that section 48a(1) cannot be satisfied by serving a demand for correction on a reporter or columnist. As discussed earlier, in providing that the demand for correction be made on the newspaper's "publisher," the Legislature sought to ensure that the demand be made on a person "who has the power effectively to correct or retract." (*Field Research, supra*, 71 Cal.2d at p. 115.) That purpose would not be served by construing the term "publisher" in section 48a(1) as including a reporter or columnist, because neither possesses the required authority and responsibility to act on behalf of the newspaper. A reporter basically gathers information on newsworthy events and prepares articles reporting the information, while a columnist may both relate information and express opinions. Although a publisher or principal editor may consult with a reporter or columnist when deciding whether to make a correction, the final decision whether to make a correction in the name of the newspaper is ultimately an editorial rather than a reporting function. Moreover, if demands for correction could be served on reporters and columnists, those in the highest positions of authority at the newspaper might never learn of them in time to investigate and make corrections.

For these reasons, I would conclude that section 48a(1)'s requirement of serving the demand for correction "upon the publisher" is satisfied by service on the owner of a newspaper, the individual that the newspaper designates as its publisher, or the newspaper's principal editor.

### III.

I would also conclude that the word "serve" should be given its ordinary meaning. Section 48a(1) says that the demand for correction shall be "serve[d] upon the publisher." The majority, ignoring its previous acknowledgement that this court must construe statutory language according to it usual, ordinary import (maj. opn., *ante*, at p. 656), gives the word "serve" an extremely expansive definition, which includes *any* of the following: (1) service upon the publisher (maj. opn., *ante*, p. 658), (2) service upon a person designated by the publisher to receive a demand for correction (*ibid.*), (3) service on any employee of the newspaper when the publisher acquires actual knowledge of the demand for correction within the statutory time limit (*ibid.*), (4) service on anyone who had " 'actual authority [to make corrections] by delegation from the publisher' " (*ibid.*), and (5) service on "anyone who had authority" (to make corrections) based on " 'a pattern or practice developed over a period of years' " (*ibid.*).

The word "serve" as used in section 48a(1) is not ambiguous. The term is used in the statutory context of giving notice. Service in such a context

means to exhibit or deliver the demand to a person who is thereby notified of some action, proceeding or request. (Black's Law Dict., *supra*, p. 1368, col. 1.) There is nothing in either the statutory language or purpose that suggests that the word "serve" should be given a meaning other than its usual, ordinary import. Serving the demand on the publisher ensures that it is given to someone with the ability to act on it. And service may be easily done. Service of a demand for correction may be accomplished, as it was here, simply by mailing it. (See Code Civ. Proc., § 1012 [service may be made by ordinary mail when there is regular communication between two different places.].)

Under the majority's expansive definition of "serve," plaintiffs can comply with the statutory requirement that a demand for correction be "served upon the publisher" by giving the demand to a wide variety of persons, many of whom may lack the power to correct. This impairs the purpose of the express statutory requirement that serving the demand upon the publisher ensures that the notice is served on an individual "who has the power effectively to correct or retract." (*Field Research, supra*, 71 Cal.2d at p. 115.) Under the majority's approach, however, whether the individuals within a newspaper's organization who have the power to correct or retract receive actual notice of the plaintiff's correction demand within the requisite time will be happenstance.[3]

The majority's approach needlessly wastes judicial and litigant resources by fostering unnecessary controversy. Because service of a demand for correction of assertedly libelous statements is a prerequisite to a plaintiff's recovery of general or punitive damages, extensive pretrial discovery and trial will be necessary to resolve any of the following issues: (1) who, if anyone, the publisher has designated to receive demands for corrections, (2) whether a publisher actually knew of a demand given any employee, (3) whether the publisher made "an actual delegation of authority," or (4) whether the publisher delegated authority by pattern or practice.

Courts and litigants will now have to engage in extensive litigation to resolve the numerous disputed factual issues generated by the majority's

---

[3]The following example illustrates how the uncertainty of the majority's approach will lead, without any relationship to the statutory purpose or language, to contradictory results. Assume newspaper A and newspaper B both publish the same defamatory statement about the plaintiff. Plaintiff serves a demand for correction on a reporter from each of the newspapers. The reporter for newspaper A promptly informs the publisher; the reporter for newspaper B loses or deliberately destroys the demand for correction. Neither newspaper makes a correction. Under the majority's holding, the plaintiff will recover general, special, and possibly punitive damages from newspaper A, but only special damages from newspaper B. Thus, under the majority's analysis, identical acts by the plaintiff will lead to completely different legal results because of circumstances entirely unrelated to the plaintiff's attempt to comply with the statute.

holding. In this very case, the parties will have to litigate, among other things, whether there was a delegation of authority established by a pattern or practice over a period of years. To prepare for this litigation, the parties may engage in extensive discovery directed to the relationship between reporters, editors, and the publisher, among others, as well as the formal and informal operations of the newspaper. Thus, the majority's approach frustrates not only the specific purpose of the statutory requirement that the demand for correction be served upon the publisher, but also the Legislature's overall objective in enacting section 48a, which was to encourage a more active press through the reduction of litigation burdens imposed on newspapers. (See *Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 30; *Field Research, supra,* 71 Cal.2d at p. 115; *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d at p. 128.)

The uncertainty created by the majority is unnecessary. Consistent with my conclusion that the term "publisher," as used in section 48a(1), includes the newspaper's owner, the individual it has designated in its masthead as its publisher, or its principal editor, I would conclude that the statute's requirement of serving the correction demand on the publisher is satisfied by service on any of the individuals just enumerated. It enables those demanding a correction to readily identify the proper parties to serve, and to simply and effectively accomplish such service. Also, it ensures that the proper person within the newspaper's organization receives the correction demand within the statutory period. And when a plaintiff in a defamation action against a newspaper seeks general and punitive damages as well as special damages, this construction of section 48a(1) enables trial courts to determine from the pleadings in the early stages of the litigation whether the plaintiff has complied with the statutory requirement. This straightforward statutory construction, in contrast to the majority's cumbersome approach, does not require pretrial discovery and trial proceedings to resolve evidentiary issues. Thus, it avoids the needless and wasteful expenditure of judicial and litigant resources that will result from the majority's holding.

## IV.

In this case, plaintiff mailed his demand for correction to the editor of the newspaper. In my view, plaintiff thereby satisfied the requirement of section 48a(1) that the demand be served upon the publisher. I would reverse the

judgment of the Court of Appeal with directions to affirm the order denying the motion to strike.

Lucas, C. J., concurred.