[No. E010772. Fourth Dist., Div. Two. Feb. 17, 1994.]

ROGER DENNEY et al., Plaintiffs and Appellants, v.
E. M. LAWRENCE et al., Defendants and Respondents.

928

**COUNSEL**

Donald Perry Rhoads for Plaintiffs and Appellants.

Tuverson & Hillyard, Scott L. Ghormley, Joshua M. Wolff, Best, Best & Krieger and Barton C. Gaut for Defendants and Respondents.

## OPINION

## TIMLIN, J.—

### INTRODUCTION

Roger Denney (Roger) and Roger's wife, Marilyn Denney, (collectively plaintiffs) appeal from a stipulated judgment of dismissal entered against them and in favor of the Press Enterprise Company (Press-Enterprise) and E. M. Lawrence (Lawrence) (collectively defendants).[1] They contend that the trial court erred when it ruled, for purposes of the plaintiffs' defamation action, that Roger was a "limited public figure" in relationship to the controversy surrounding his brother Rodney Denney's (Rodney) arrest, conviction, and sentencing for the killing of Rodney's wife, Susan. This ruling had the effect of precluding plaintiffs' recovery of damages unless they first established that the defamatory statements were made with actual malice.

They also contend that, as to Lawrence, the trial court erred when it ruled that Lawrence was entitled to the protection of Civil Code section 48a, with which plaintiffs admittedly had failed to comply, resulting in plaintiffs, being limited to recovering special, rather than special, general and exemplary damages, from Lawrence.

### FACTS

Roger and Rodney were identical twins. Both had been sheriff's officers for the County of San Bernardino. Roger had retired from the sheriff's department and had become a private investigator.

On February 5, 1985, Rodney stabbed to death his wife, Susan. In March 1985, Rodney was arrested as Susan's killer. He was released from custody after Roger put up his home as security for Rodney's bail. Roger also hired Rodney to work for him after his release and before the trial.

---

[1]Plaintiffs failed to comply with California Rules of Court, rule 13, which requires opening briefs to contain a statement indicating that the judgment or order from which the appeal is taken is in fact an appealable order or judgment. Generally, there is no right to appeal after a voluntary dismissal. (*Cook* v. *Stewart McKee & Co.* (1945) 68 Cal.App.2d 758, 761 [157 P.2d 868].) However, when a dismissal was requested after an adverse trial court ruling so that an appeal could be taken promptly, and operates as a request for an entry of judgment based on the adverse ruling, an appeal will lie. (*Ashland Chemical Co.* v. *Provence* (1982) 129 Cal.App.3d 790, 792-793 [181 Cal.Rptr. 340].) Plaintiffs, Lawrence, and the Press-Enterprise stipulated to the judgment of dismissal after the lower court's rulings limited plaintiffs to recovery of special damages only, and that upon a showing of actual malice. We therefore conclude that the appeal is proper.

The killing generated intense local media publicity, in part because of the brutal nature of the slaying and in part because the brothers were well-known members of the community. Some 19 articles appeared in the Sun-Telegram (Sun), and Rodney's picture was in the paper at least 10 times, all of which were related to the homicide and Rodney's arrest, bail hearing, trial, conviction and sentencing. Roger collected 31 articles about these events, including 9 in which his own name was mentioned.

Roger gave the Press-Enterprise newspaper a photograph of himself, Rodney and their mother for use in connection with a newspaper article about the killing. On two separate occasions he was interviewed by a Press-Enterprise reporter about the killing and Rodney's involvement. Roger's comments were printed in the newspaper. A February 19, 1985, newspaper article included Roger's comments on the killing, stating that his brother's wounds were "obviously defense wounds," and that he had seen "a lot of those in my time." He also relayed Rodney's version of the events leading to Susan's death, which version was that he was hit from behind and then saw Susan coming at him with a knife. Roger stated that his brother was not a violent person, and that Susan's death was "an unfortunate tragedy" following a fight between the couple. These latter remarks were contained in a Press-Enterprise newspaper article on March 6, 1985.

After Rodney was convicted by a jury of manslaughter, he was sentenced to seven years in prison.

On December 20, 1986, the Sun published the following letter to the editor, written by Lawrence:

"Light Sentence

"A life has been violently taken. That life flowed out through 72 stab wounds onto the floor of her home.

"For this, Roger[2] Denney was sentenced to seven years. This is our system of justice? Where, when, how, and for whom is this 'justice' doled out? This man has left a legacy of horror for Susan Denney's sons—not for seven years, but for life. This system of 'justice' will send him to prison in 'protective custody,' and of course, the certainty of parole. Next, our 'justice' will eliminate prison altogether and simply release him on probation.

"This is not the only situation in which this blasphemy of law has occurred. When do the law-abiding citizens of this, and other cities, get the secure feeling that criminals will be punished?"

---

[2]The author of the letter erroneously identified Roger as the killer, rather than Rodney.

On December 21, 1986, Roger orally requested the Sun to print a correction of this letter insofar as he was named as the person who was sentenced to prison. On the next day, the Sun printed a statement in its newspaper that the name of the defendant in Lawrence's letter was not correct, and that the killer was Rodney Denney.

A similar problem with misidentification had already occurred on December 6, 1986, when the Press-Enterprise had published in its newspaper of that date an article about Rodney's sentencing for the manslaughter conviction and juxtaposed next to the article a photograph of Roger, which was erroneously identified as being a photograph of Rodney. Roger orally notified the Press-Enterprise of its mistake on December 11, 1986, and the paper printed a correction on December 30, 1986.

Thereafter, in a second amended complaint, Roger sued Lawrence for negligence and the Sun and Press-Enterprise for libel concerning their respective publications of the letter to the editor and the erroneous photograph. His wife sued them for loss of consortium. The Press-Enterprise moved for summary judgment or summary adjudication as to certain causes of action against it and as to certain issues related to the facts surrounding the killing, Roger's involvement in the criminal proceedings against Rodney, including his assisting Rodney in posting preconviction bail and testifying for Rodney at trial, the brothers' standing in the community and Roger's interviews by a Press-Enterprise reporter. The court denied the motion for summary judgment and adjudicated the issues to be without substantial controversy.

Shortly before trial, the Press-Enterprise made a motion *in limine* for a determination by the court that Roger was a limited purpose public figure, which determination would then require Roger, in order to recover damages against the Press-Enterprise, to establish that it had acted with actual malice in making the alleged defamatory statement. That motion was granted as to the Press-Enterprise and the Sun which joined the motion.[3]

A motion was also made by the Sun and Lawrence for a ruling that because neither Lawrence nor the Sun was served with a request for correction pursuant to Civil Code section 48a, plaintiffs were limited to a recovery of special damages only against those defendants. That motion, too, was

---

[3]Lawrence did not make such a motion *in limine* but after the trial court granted the Press-Enterprise's motion, she sought to join the motion. Plaintiffs objected on the basis that Lawrence was not entitled to such a finding. The court denied Lawrence's request without prejudice. Five days later, however, the court granted the motion and found that Roger was a limited public figure as to his action against Lawrence.

granted. Based on these adverse rulings, plaintiffs stipulated to the entry of a judgment of dismissal.[4]

On appeal, plaintiffs contend that Roger was not a limited purpose public figure (limited public figure), and that Lawrence, as the author of a letter to the editor of the Sun, was not entitled to the protection of Civil Code section 48a. We conclude that (1) Roger was a limited public figure, and (2) Civil Code section 48a is not applicable to Lawrence. We will therefore affirm the stipulated judgment to the extent it adjudicates Roger to be a limited public figure in his actions against the Press-Enterprise and Lawrence, and reverse it insofar as it adjudges that plaintiffs were required by section 48a to serve Lawrence with a written notice demanding correction in order to recover general and exemplary damages from her.

## DISCUSSION

A. *Roger Was a Limited Public Figure Because of His Voluntary Involvement in the Particular Public Controversy Concerning His Brother Rodney's Arrest, Conviction, and Sentencing for the Killing of Susan, Rodney's Wife*

When a defamation action is brought by a public figure, the plaintiff, in order to recover damages, must show that the defendant acted with actual malice in publishing the defamatory communication. (*Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1688-1689 [285 Cal.Rptr. 430].) Because of this increased burden, defendants in defamation actions such as the one here obviously attempt to establish that the plaintiff was such a public figure. This is a question to be determined by the court, rather than the jury. (*Kahn* v. *Bower* (1991) 232 Cal.App.3d 1599, 1610 [284 Cal.Rptr. 244].)

The trial court's decision on the question whether a plaintiff is a limited public figure is a mixed question of law and fact. It must determine the predicate facts upon which it then concludes whether, as a matter of law, a plaintiff is or is not a limited public figure. (*Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 134-135 [162 Cal.Rptr. 701].) When the appellate court is called upon to review the trial court's decision in this regard, its standard of review is whether, after an independent review of the entire record, substantial evidence supports the trial court's decision. (See *id.*, at pp. 135, 139, 142-143.)

---

[4]During the *in limine* proceedings, the Sun was successful in its motion for a judgment on the pleadings as to those causes of action against it and in effect they were dismissed as a defendant. Plaintiffs have not appealed the trial court's granting the Sun's motion for a judgment on the pleadings.

■ A person may become a public figure in several different ways. Some persons have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts. (*Mosesian* v. *McClatchy Newspapers, supra,* 233 Cal.App.3d at p. 1689; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 812, 94 S.Ct. 2997].) Other persons, who are sometimes denominated as "limited" purpose public figures, are persons who have either voluntarily injected themselves into a particular public controversy, or who have been drawn into such controversies. These persons thereby become public figures as to the particular issue or controversy with which they are associated. (*Mosesian* v. *McClatchy Newspapers, supra,* 233 Cal.App.3d at p. 1689; *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 351.)

■ Here, plaintiffs contend that the trial court erred by determining that Roger was a limited public figure as to the public controversy surrounding his brother Rodney's arrest, conviction and sentencing for the killing of Susan, Rodney's wife.

They assert that Roger did not voluntarily thrust himself into the public eye as to this controversy, but that instead he "merely" "responded to reporters' questions relating to the incident," and that his other acts, such as providing Rodney with bail, testifying at trial, giving a family photograph to the press and hiring his brother to work for his investigation business, did not constitute the sort of voluntary acts designed to influence public opinion and which indicate that the actor has become a limited public figure. He cites in particular *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], which held that merely doing business with parties in a public controversy does not elevate one's status to that of a public figure. (*Id.* at p. 769.) *Vegod Corp.* might be supportive of Roger's position if he had done no more than hire Rodney following Susan's death, but it is not particularly persuasive here, where the uncontroverted facts establish that Roger did much more than merely hire his brother at a time when Rodney was presumably a public figure by reason of the tragic death of his wife and the media publicity about his arrest and being charged with her murder.

Roger also argues that he did nothing more than any brother would have done. His arguments in this regard fail to recognize certain important facts which show that Roger's conduct involves something more than a brother merely "responding" to a few questions from the press.

Given the facts of this particular case, we believe that another case involving two brothers and a familial murder is more instructive on the issue

of what circumstances may cause one to become a limited public figure.[5] In *Dresbach* v. *Doubleday & Co., Inc.* (D.D.C. 1981) 518 F.Supp. 1285, Lee Dresbach sued author Michael Mewshaw and publisher Doubleday & Company for invasion of privacy and libel arising from the publication of Mewshaw's book, Life for Death. The book was based on the story of the 1961 murders of Dresbach's parents by Dresbach's older brother, Wayne, who was 15 years old at the time of the murders. Wayne eventually was convicted of murdering his parents.

At the time of the murder, Lee Dresbach was 14 years old. His role in the case was this: "he merely described what he witnessed *when required to do so by police and the Court.* He *never took a position on any issue,* and was not the object of controversy himself. At most, he was casually mentioned as Wayne's brother in some of the newspaper articles about the murders. *His trial testimony was not determinative or controversial, since Wayne repeatedly confessed the murders himself.*" (518 F.Supp. at p. 1294, italics added.)

Based on these facts, the court concluded, as a matter of law, that Lee Dresbach was not a public figure for limited purposes. (518 F.Supp. at p. 1294.) In doing so, it contrasted Lee Dresbach's involvement in the matter which had attracted public attention (the crime) with the involvement of plaintiff Street in the case of *Street* v. *National Broadcasting Co.* (6th Cir. 1981) 645 F.2d 1227. Street was the White woman who had claimed to have been raped by nine Black youths who came to be known as the "Scottsboro boys." After first pointing out that, as an alleged rape victim, Street had not voluntarily thrust herself into a public controversy, the Dresbach court noted that she was nonetheless held to be a public figure *because she gave press interviews and aggressively promoted her version of the case outside the courtroom,* and because she " 'played a major role, had effective access to the media and encouraged public interest in herself.' [Citation.]" (518 F.Supp. at p. 1295.)

Likewise, in this case, Roger's involvement in the controversy, i.e., the pending criminal charges against his brother, was much more like that of Street than of Lee Dresbach. Unlike Lee Dresbach, who merely described what he witnessed when required to do so by the police and/or court, and who took no position on the controversy, Roger gave press interviews (which, of course, he could not be forced to do, and which thus must be said to have been done voluntarily) and, rather than limiting his comments to matters he had witnessed, he promoted a version of the case favorable to his brother, taking advantage of his own position as an intimate of his brother

---

[5]It is clear that merely being the relative of a public figure does not, in and of itself, make one a limited public figure.

and sister-in-law, as well as his apparent expertise as a former deputy sheriff and current private investigator, to influence public opinion as to the circumstances surrounding the killing and his brother's culpability, if any, for the homicide.

Furthermore, unlike the situation in the *Dresbach* case, where Wayne had confessed to the murders, here, Rodney (who was reported as having initially told the police that he and his wife were attacked by an intruder) had been advised by his attorney not to talk to the police or the press. However, Roger indicated to the press that *he* had spoken with Rodney, and had seen Rodney's wounds. Roger's self-proclaimed access to Rodney, particularly when coupled with Roger's professional experience and his close familial relationship to Rodney, made Roger's comments to the press[6] particularly germane to the public controversy, and particularly likely to influence public sentiment.

When all these particular facts are considered, it becomes apparent that Roger voluntarily thrust himself into the limelight and initiated public debate on an issue of obvious public interest, to wit, whether Susan's death was the result of (1) an "unfortunate" "husband-wife dispute" in which she was the aggressor, or (2) an attack by an intruder, or (3) an attack by Rodney as the aggressor. Because Roger thus voluntarily involved himself in the public debate and attempted to influence public opinion, he thereby became at least a limited public figure.

Accordingly, we conclude that there was substantial evidence to support the trial court's conclusion that Roger was a limited public figure as to matters related to Rodney's arrest, trial, conviction and sentencing for Susan's murder.

### B. *The Requirements of Civil Code Section 48a Do Not Apply to Defendant Lawrence*

Plaintiffs did not serve a written request for correction upon the Press-Enterprise, nor upon Lawrence. Plaintiffs acknowledge that this failure to request a correction prevents them from seeking more than special damages from the Press-Enterprise, but contend that service of a such a request on Lawrence is not a prerequisite to seeking general and exemplary

---

[6]Specifically, Roger's comments to the Press-Enterprise reporter were quoted as follows in a newspaper article concerning Susan's death: " 'I can't make a definite judgment because I haven't seen the crime scene, but the cuts on Rod's hands are obviously defense wounds,' the result of using his hands as a shield from an attacker. 'I've seen a lot of those in my time. The wounds on his hands and the blunt trauma force to his head obviously were not self-inflicted.' "

damages from her. The trial court, however, held that the requirements of Civil Code section 48a applied to Lawrence as well as to the newspaper.[7]

On appeal, plaintiffs first urge that there was a completed publication within the meaning of the law of defamation when Lawrence sent her letter to the editor of the Sun and this publication is separate and apart from the "publication" as that word is used in Civil Code section 48a, subdivision 1, which occurred when the Sun printed Lawrence's letter. They then urge that Lawrence's publication is not entitled to the protection which is afforded to "reporters, columnists, authors, critics, editors and the publisher" pursuant to the holding of *Pridonoff* v. *Balokovich* (1951) 36 Cal.2d 788 [228 P.2d 6], because she is "not in the mass media business," and because she was not "an employee, author, or writer for the newspaper, but merely a citizen sending a letter to the editor."

Lawrence, however, contends that she is entitled to the protection of Civil Code section 48a, because (1) *Pridonoff* extended the applicability of Civil Code section 48a to "[a]ll participants in newspaper publications" (36 Cal.2d at p. 791); (2) the court in *Pridonoff* did not distinguish between "staff" participants and others, such as "guest editors and authors of 'letters to the editor,'" and (3) the Sun solicited and then selected her letter for publication, using as its stated criteria "merit on a subject of current interest," thus making her in effect a "guest editor" and a "participant" in the newspaper's publication.

Lawrence argues that the authors of letters to the editor serve a vital function of the press which is separate and distinguishable from the function served by those whose statements are merely quoted by the media (and who are *not* protected by Civil Code section 48a). (*Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 115 [77 Cal.Rptr. 243, 453 P.2d 747].) According to Lawrence, "guest editors" "allow the press to better service the community by airing different viewpoints of members of that community. This gives the press greater breadth in the dissemination of news and viewpoints than would otherwise be achieved through reliance solely on regular staff participants." Finally, she argues that Civil Code section 48a was enacted to encourage an active press and that depriving "guest editors" such as herself of its protection would frustrate this purpose.

---

[7]Civil Code section 48a provides, in relevant part: "1. In any action for damages for the publication of a libel in a newspaper, . . . plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication . . . , a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous."

Unfortunately, there is no definitive California law on this particular issue. The question of who, other than "traditional" media participants, such as reporters, columnists, authors, critics, editors and publishers, is protected by Civil Code section 48a was addressed in *Field Research Corp.* v. *Superior Court, supra,* 71 Cal.2d 110, but the defendant in that case was not the author of a letter to the editor.

In *Field Research Corp.*, William P. Patrick, a Republican candidate for nomination to run for state Governor, had told newspaper reporters that a Field poll about his relative popularity among voters was dishonest and inaccurate. His remarks were subsequently printed in some of the newspapers, and the Field Research Corporation then sued him for defamation. Patrick asserted the company's failure to request a correction pursuant to Civil Code section 48a as a defense to the company's claim against him for punitive and general damages. The California Supreme Court held Patrick was not protected by section 48a:

"None of the reasons for applying section 48a to participants in news media apply to Patrick. At the time he made the statements complained of he was a private citizen and candidate for public office and not a participant in a publishing or broadcasting enterprise. Patrick, as well as the statements he made, were themselves news. The fact that he was seen and his statements heard and recorded by representatives of the news media does not make him a disseminator of news any more than any other person whose activities or utterances are reported by the media thereby becomes a disseminator of news. We realize, of course, that the news value of Patrick's allegations was twofold. He made his accusations as a candidate and public figure. If the charges were true, it would certainly be news that the Field Poll had been 'bought.' There is a significant difference, however, between one who occasionally discovers and makes public an item that is newsworthy and one who, *as a daily occupation or business*, collects, collates, evaluates, reduces to communicable form, and communicates the news. It is these latter activities that the Legislature sought to protect by section 48a." (71 Cal.2d at pp. 115-116, italics added.) The *Field Research Corp.* court then went on to note that the media which had reported Patrick's statements could not have effectively corrected or retracted his statements, and therefore they could not have mitigated the "sting of the alleged defamation." (*Id.* at p. 116.)[8]

Here, Lawrence, unlike Patrick, was not herself a personally newsworthy figure, and her statement about Susan's murder and the sentence Rodney

---

[8]The distinction between participants and nonparticipants in the publishing or broadcasting enterprise was further refined in *Dietrich* v. *Litton Industries, Inc.* (1970) 12 Cal.App.3d 704, 711-712 [90 Cal.Rptr. 856]. In *Dietrich*, the defendants in a libel action urged that they were entitled to the protection of Civil Code section 48a as participants in a news dissemination enterprise, because, after being approached by the press for a statement, they prepared and

received for committing such, was newsworthy only because it expressed the opinion of a member of the public about the trial's outcome, not because it contained any new substantive information or accusations. Furthermore, given the nature of the error contained in Lawrence's letter, the Sun, if served with plaintiff's written request for correction, was in a good position to effectively correct the letter's error, so as to mitigate the "sting" of the error. It in fact did so upon Roger's oral request.

However, like Patrick, Lawrence was not involved in "a daily occupation" or "business" of collecting and communicating the news. Thus, the question becomes whether the differences between Lawrence's situation and that of Patrick are sufficiently different and important to override what seems to have been the most important aspect of the holdings in both *Pridonoff* and *Field Research Corp.*, to wit, that section 48a was intended to protect only those engaged in the *business* of news dissemination. We conclude that, in fact, it is this last factor which is determinative, and that the author of a letter to the editor is not engaged in the business of news dissemination.[9]

Our conclusion in this regard is further supported by the fact that the *Field Research Corp.* court, without directly so holding, gave some indication that the author of a letter to the editor would not be considered to be a media "participant" entitled to the protection of Civil Code section 48a when, in a footnote, it disapproved of *Howard* v. *Southern Cal. etc. Newspapers* (1950) 95 Cal.App.2d 580 [213 P.2d 399] to the extent that that case "would extend the application of section 48a to nonparticipants in publishing and broadcasting enterprises, . . ." (71 Cal.2d at p. 114, fn. 4.)

---

distributed a press release. On appeal, the reviewing court held that this did not make them participants within the meaning of *Field Research Corp.*:

"Granting that [defendants] were, in a sense, writing a story for a newspaper, their position is distinguishable from that of the ordinary news gatherer whom the statute protects. The typical newsman frequently has no firsthand knowledge of the subject, and can only report what others have told him. In order not to discourage the rapid dissemination of news, section 48a places a limitation upon the recovery of damages for libel. [Defendant] issued his press release under quite different conditions. The news media came to him because he had firsthand knowledge of the facts. Had the press asked him to comment upon matters on which he lacked certain knowledge, he could have, with good grace, explained that he did not know. But this inquiry related directly to [defendant's] own personal background. He was not in need of the protection given by section 48a. It was not the purpose of section 48a to encourage a person questioned concerning his own conduct to give false information with impunity. Section 48a therefore offers no defense to the parties here." (12 Cal.App.3d at p. 712.)

[9]Recently, the Supreme Court in *Freedom Newspapers, Inc.* v. *Superior Court* (1992) 4 Cal.4th 652, 656 [14 Cal.Rptr.2d 839, 842 P.2d 138], stated in dicta: "This court previously has interpreted section 48a. In *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 113 [77 Cal.Rptr. 243, 453 P.2d 747], *we held that this statute protects persons 'engaged in the news dissemination industry' and not 'third parties' whose allegedly defamatory statements were published by the news media.*" (Italics added.)

In *Howard*, the Glendale News-Press published a letter to the editor which expressed certain negative views about Austin Howard, who was then active in a recall movement against some city officials. Howard presented the newspaper with a demand for retraction pursuant to Civil Code section 48a, and then sued the paper and the letter's authors, Donald and W. E. Close, for general damages for libel. The defendants' demurrers were sustained (the grounds for the demurrers are not stated in the opinion), and on appeal the reviewing court held that the letter was not libelous per se, and that it contained opinions rather than statements of fact. The necessity of serving the letter's author with a demand for retraction was not raised in the opinion, but the implication, with which *Field Research Corp.* disagreed, was that the demand served on the newspaper sufficed as a demand on the authors of the letter as well, and that the plaintiff could not have recovered general damages from the authors as well as the newspaper without having made the demand for retraction.[10]

Based on the *Field Research Corp.* holding that Civil Code section 48a applies only to those in the business of collecting and disseminating the news, as well as that opinion's disapproval of the *Howard* case to the extent such case appeared to extend the application of section 48a to a "nonparticipant" in such business, i.e., to the authors of a letter to the editor, we conclude that Lawrence was not protected by section 48a and plaintiffs were not required to serve a demand for correction on Lawrence before they could seek general and exemplary damages from her. (See also *Wheeler* v. *Green* (1979) 286 Ore. 99 [593 P.2d 777, 789-791], discussing *Pridonoff* and *Field Research Corp.* and concluding that Oregon's similarly worded retraction statute does not apply to the authors of letters to newsletters.)

### DISPOSITION

That portion of the stipulated judgment which adjudges that plaintiffs may not recover general or exemplary damages from Lawrence on their first and second causes of action because they did not timely serve her with a demand for correction under Civil Code section 48a is reversed.

That portion of the stipulated judgment which adjudicates that plaintiff Roger Denney is a limited purpose public figure as to plaintiffs' causes of action against the Press-Enterprise and Lawrence is affirmed.

---

[10]The *Field Research Corp.* court also disapproved of the opinions in *Farr* v. *Bramblett* (1955) 132 Cal.App.2d 36 [281 P.2d 372] and *Larrick* v. *Gilloon* (1959) 176 Cal.App.2d 408 [1 Cal.Rptr. 360]. *Farr* held that Civil Code section 48a applied to the publication of libelous paid advertisements, so that a demand on the newspaper's publisher for retraction was a prerequisite to recovering general and exemplary damages from the "persons furnishing and paying for the publication of a libelous advertisement in a newspaper." (132 Cal.App.2d at p. 43.) *Larrick* held such a demand on the publisher sufficed in place of a demand on the individual whose libelous statements were quoted in the newspaper. (176 Cal.App.2d at pp. 420-421.)

The effect of these dispositions is that plaintiffs may recover damages against the defendants, Press-Enterprise and Lawrence, only if they prove by clear and convincing evidence that each defendant acted with actual malice in publishing the alleged defamatory communication attributed to each defendant. If they so carry their burden of producing evidence and their burden of proof on these allegations, plaintiffs are entitled to recover against the Press-Enterprise, subject to proof, only special damages, and to recover against Lawrence, subject to proof, general, special and exemplary damages.

This case is remanded to the trial court for further proceedings consistent with this opinion and the resulting dispositions.

The parties shall bear their own costs on appeal.

Dabney, Acting P. J., and McKinster, J., concurred.